**Eric C. RAJALA, Trustee in Bankruptcy for General Poly Corporation, Plaintiff,**

v.

**ALLIED CORPORATION, Defendant.**

**No. 82–2282–K.**

United States District Court, D. Kansas.

Oct. 30, 1986.

---

Ronald L. Holt, Stinson, Mag & Fizzell, Kansas City, Mo., for plaintiff.

W. Dennis Cross, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

This case is before the court on defendant's motion for summary judgment. This action is brought by the trustee in bankruptcy, Eric C. Rajala, for General Poly Corporation, against Allied Corporation for breach of contract, breach of fiduciary duty, conversion, and fraud. For the reasons set forth herein, defendant's motion for summary judgment will be denied, except as to Count XIII, alleging an overall scheme to defraud.

The facts in this lawsuit are largely disputed. In 1978, Clayton A. Walker and Hans H. Traver developed plans to form the company which later became General Poly. Their plan was to form a company which would engage in the business of converting high density polyethylene (HDPE) into film and film products such as plastic milk bottles, large drums, pails, housewares, and storage containers. Conversion of "film grade" HDPE into film and film products is accomplished by a method known as "extrusion". Special extrusion equipment is needed for this process. Some HDPE has a higher molecular weight than other HDPE and is referred to as high molecular weight high density polyethylene (HMWHD). Film products made from prime HMWHD film grade resins have significant strength advantages over products made from ordinary HDPE or from traditional low density polyethylene resins. Also, due to its strength advantages, thinner film can be produced from HMWHD resins, offering a producer of bags and film the potential for more profit.

At the time that Walker and Traver began making plans for General Poly, Walker was the principal shareholder of Vinylplex, a company engaged in the manufacture and sale of plastic pipe. Mr. Traver was the principal shareholder of PeruPlast, a company in Lima, Peru, engaged in the manufacture and sale of various plastic products, including HMWHD film and bags.

In and prior to 1978, HMWHD film grade resin was widely used in Japan, western European countries, and South America for the production of film and bags, but such HMWHD products had not penetrated the market in the United States as there were no companies in the United States which were producing and selling commercial quantities of prime HMWHD film grade resin. At that time, a German chemical company known as Hoechst, A.G. was producing an HMWHD film grade resin which was regarded as the industry standard. During 1978 through 1980, Hoechst, A.G. imported only limited quantities of its 9255F HMWHD film grade resin into the United States. This resin was being sold in the United States at a premium price due in part to higher costs of the raw materials for the resin in Europe and the absence of any other prime HMWHD film grade resin in commercial quantities in the United States. Therefore, for General Poly to buy resin exclusively from European suppliers would have been too costly, so General Poly sought to find a domestic company which could develop and produce a resin equal in quality to that produced in Europe.

In 1978, Allied Corporation began studying the possibility of producing film grade

HMWHD resin in the United States. Allied is a New York corporation which is, and at all relevant times was, a manufacturer and supplier of HDPE resin. In order for Allied to successfully develop the HMWHD resin, it needed access to state of the art, specialized extrusion equipment and experienced extrusion operators. In 1978, Allied did not have this specialized equipment, which was extremely costly, nor did it have any right of access to any such equipment in any location in the United States.

In October of 1978, a representative of Allied met with General Poly's promoters. Allied informed the promoters it was engaged in a film development program and was pursuing development and commercial production of an HMWHD film grade resin. General Poly's promoters advised Allied of their tentative plans to establish a film and bag plant in the Kansas City, Missouri area, which would be dedicated to the production of HMWHD film and bags, and they stated they were seeking a domestic supply of resin. At that time it was arranged that the General Poly promoters would later meet with Allied's Pat Snell, who headed the HMWHD film development program, regarding the status of that program and Allied's progress in development of an HMWHD film grade resin. A few days later, Allied tentatively indicated to Traver that Allied could furnish Traver with a "developmental resin" for Traver to evaluate at his PeruPlast Plant. An Allied interoffice memorandum reporting on this meeting stated it would be a "great benefit" for Allied to be "in on the ground floor" with the planned General Poly operation, and that the "only concern at the moment [was] whether or not ... [Allied] could put together a suitable sample for the Lima, Peru operation to get this thing started." When Allied's Pat Snell received a copy of this memorandum, he added a handwritten note stating that the developmental resin which Allied could send to Traver's PeruPlast Plant was a commercial HMWHD film grade resin produced and sold in Europe by a Belgian company named Solvay et Cie.

On January 10, 1979, Walker and Traver met with several of Allied's representatives. According to plaintiff, Walker and Traver told the Allied representatives that they needed to have a domestic supply of HMWHD film grade resin equivalent to or better than the industry leader, Hoechst 9255F, and that they would not form the proposed film and bag company without obtaining such a source. They also indicated the proposed company would need to have financial assistance from Allied. Walker requested that Allied either purchase some of the bonds or guarantee the bond issue. Traver indicated that General Poly would provide technical assistance to Allied by evaluating Allied's experimental HMWHD film grade resins at the PeruPlast Plant, which had the needed specialized extrusion equipment and experienced operators. Traver and Walker indicated their proposed plant could be in operation toward the end of 1979. According to plaintiff, Allied's representatives stated that Allied was already at work on an HMWHD film grade resin development program, that Allied possessed the necessary catalyst, and that it only needed to tinker with the catalyst in order to perfect the resin. Allied stated it needed access to the specialized extrusion line design for HMWHD film, which Allied did not have. Allied further stated that with the availability of the PeruPlast Plant, Allied's timing for completion of the development program would coincide with the promoters' timing for the commencement of manufacturing operations toward the end of 1979, and that Allied could then have a prime HMWHD film grade resin available in commercial quantities for the proposed General Poly Plant. As to offering financial assistance, Allied stated that rather than backing the bond issue it could provide financial assistance to the proposed General Poly operation in the form of extended credit terms.

The parties concluded their meeting by agreeing to commence a joint development program, under which General Poly would provide extrusion technology and assist-

ance to Allied in the evaluation and perfection of its planned HMWHD film grade resin, and Allied, in exchange, would agree to supply General Poly with prime HMWHD film grade resin of a quality and performance equal to or better than the then industry standard—Hoechst 9255F—at the time General Poly commenced manufacturing operations toward the end of 1979, with such resin being provided at a favorable price below the prevailing Hoechst price and on extended trade credit terms.

Plaintiff alleges that in a later phone conversation between Walker and an Allied representative, Allied agreed to provide 90-day credit terms, and perhaps more. According to Walker, Allied also stated that the HMWHD film grade resin would be priced to General Poly at a price within one to two cents of prevailing prices of Allied's existing injection molding grade resins.

On January 23, 1979, Allied wrote a letter to Walker confirming the parties' joint cooperation agreement. The letter stated Allied wanted General Poly's promoters to evaluate Allied's new resins as they were developed at the PeruPlast Plant in Lima, Peru, and further, that Allied would be forwarding to Walker "a secrecy agreement required to ensure the confidentiality of our joint effort."

A draft of the proposed secrecy agreement between the parties was prepared by Allied's law department and forwarded to Walker on February 14, 1979. Plaintiff claims this agreement was intended only as a partial memorialization of the parties' January agreement. When Walker received the written document, he made a few changes, including the addition of a provision stating that General Poly would have the first right to purchase any new HDPE film grade resin produced by Allied on a semi-commercial or commercial scale, up to 80% of General Poly's monthly requirements, for a period of three years following the commercial or semi-commercial production of the resin by Allied. According to plaintiff, Walker added the right of purchase provision so there would be

some reference in the written secrecy and joint cooperation agreement to the parties' January oral agreement that Allied would supply General Poly with an HMWHD film grade resin at the time General Poly began operations at the end of 1979 and thereafter. Plaintiff alleges this reference was needed to provide assurance to the underwriters handling General Poly's bond issue that Allied had committed to supply General Poly with resin. In August of 1979, a second draft, which included a first right to purchase provision, was prepared by Allied and sent to Walker. On August 28, 1979, Traver signed the agreement on behalf of General Poly. He made one last slight revision and confirmed in his letter to Allied that with that change the agreement would "reflect totally the intent of Allied and General Poly." Allied agreed to the final change and signed the agreement on September 21, 1979.

As finally signed, the September 21 agreement between Allied and General Poly included three principal provisions: (1) the parties would cooperate to develop HDPE resins and films for a period of one year, during which Allied would have the royalty-free right to use extrusion technology developed by General Poly; (2) each party would maintain in confidence for a period of five years information disclosed in writing by the other; and (3) General Poly would have, upon 30 days written notice, a first right to purchase 50,000 lbs. per month of any new HDPE film grade resin developed by Allied for a period commencing with Allied's production of resin on a commercial or semi-commercial scale and for three years thereafter.

During the period the secrecy and joint cooperation agreement was being negotiated, the parties began to act pursuant to their agreement. On March 26 and 27, 1979, Allied's Pat Snell visited Traver's PeruPlast Plant and attended and participated in tests of what was purported by Allied to be Allied's "developmental resin Paxon 7-392" (Paxon is Allied's trade name). In actuality, the resin tested by Allied was rebagged Solvay Eltex B5920F resin, which

was produced by a European company. Traver's employees at the Peru plant, who observed the test of the resin, reported to Traver that the resin, while not yet as good as the German resin, produced quite strong film and was very promising. Allied never informed anyone of the true source of its resin. Following these tests, Traver related the results to Walker, and he, in turn, advised bond underwriters that the tests of Allied's experimental resin showed Allied was not far from the industry standard, and the General Poly promoters felt confident Allied could reach the goal by the time General Poly commenced operations in late 1979. Walker also assured the underwriters that in any event the Allied experimental resin tested in Peru was already good enough quality for General Poly to utilize it in the United States market. With these assurances, the underwriters proceeded to consummate the bond issue and sell the bonds.

In June of 1979, Traver visited Allied representatives and was advised Allied would soon have a new formulation of HMWHD film grade resin for testing. Later that month Traver wrote to Allied advising that General Poly expected to commence manufacturing operations in October of that year and wished to make arrangements for its first shipment of Allied's HMWHD film grade resins. In August of 1979, Allied representatives visited General Poly's new plant and advised Traver that Allied expected to soon be able to ship its first railcar of HMWHD film grade resin to General Poly.

A second test of Allied's developmental resin was conducted at laboratory facilities in Massachusetts on August 23, 1979. General Poly representatives were present. Although the experimental resin proved to be a failure, Allied assured the General Poly representatives that it would correct the deficiencies in the resin and would soon have an improved batch of resin for General Poly to test.

In short, after Allied's successful tests of its "experimental resin" in Peru, subsequent tests conducted at the General Poly Plant of its experimental resin were continually unsuccessful. When General Poly was ready to begin production in October, 1979, it was forced to purchase the expensive German resin (Hoechst 9255F). Throughout this time Allied continued to represent that a satisfactory resin was "just around the corner." However, General Poly was not able to purchase any resin from Allied until July of 1980, when it purchased an "off grade railcar full" which resulted from Allied's mixing of various test batches of resin resulting in a "rainbow mixture" which was not reproducible. General Poly had to mix this resin with the higher quality German resin in order to obtain a satisfactory film.

Plaintiff alleges that in July of 1980 Allied had produced a new resin which it believed was suitable for General Poly's purposes. However, according to plaintiff, General Poly was not informed of this new resin or given a chance to test it until September of 1980, although Allied had previously offered it to other customers. At the time of the September evaluation, Traver was pleased with the improvement in the performance of the resin sample and was of the impression Allied was close to the point of being able to produce an HMWHD film grade resin closely approximating the quality of Hoechst 9255F. Traver gave Allied written notice of his intention to order many railcars of this resin for the months of November and December, 1980, and the beginning months of 1981.

According to plaintiff, the first three railcars of resin which had been sampled at the film trial in September of 1980 proved to be resin of fairly good quality requiring some, but not substantial, blending with Hoechst 9255F. However, subsequent railcars of Allied resin received by General Poly in late 1980, and thereafter, became increasingly worse in quality, particularly in the area of strength and resistance to splitting, and they required substantial blending with Hoechst 9255F resin in order to produce a salable product.

Throughout late 1980 and into 1981, Allied continued to supply General Poly with poor quality resin that had to be combined with the Hoechst resin at all times. All sales were made on 90-day credit terms. Because the mixing process slowed General Poly's ability to produce film considerably, General Poly fell behind on some of its payments. During this time, a total of 13 railcars of resin were delivered to General Poly.

In May of 1981, General Poly tested a new Allied resin which appeared to be the equivalent to the German resin. General Poly was very enthusiastic and desired to exchange two railcars of unused poor quality resin for the new resin, and then apply the credit for the old railcars against General Poly's oldest outstanding debt with Allied. According to plaintiff, Allied agreed to the exchange but refused to apply the credit against anything except the railcars actually returned. General Poly informed Allied that a financing bank had a lien on the two railcars which it desired to return to Allied. Allied picked up the two unused railcars of resin, but never delivered the new railcars.

In July of 1981, Allied informed General Poly that it could no longer sell to them on credit, and that all future sales would have to be on a cash basis. General Poly initially agreed, being badly in need of resin, but later reneged due to lack of available cash.

By mid-October of 1981, General Poly had completely exhausted its resin supply and ceased manufacturing operations. In September of 1981, General Poly's financing bank formally called General Poly's notes. Thereafter the company filed a petition in bankruptcy under Chapter 11 of the Bankruptcy Act on January 8, 1982.

In August of 1982, General Poly filed this lawsuit alleging that Allied's breach of the agreements between the parties, its breach of fiduciary duty, and its fraudulent actions, resulted in the financial collapse of General Poly and forced it to seek protection from its creditors pursuant to the Bankruptcy Act. Plaintiff's complaint sets forth the following claims:

Count I—breach of the oral joint venture agreement;

Count II—breach of the written agreement;

Count III—unjust enrichment by Allied in having royalty-free access to General Poly's extrusion technology;

Count IV—breach of the financing agreement;

Count V—quantum meruit theory to recover royalty costs for Allied's use of the extrusion technology;

Count VI—conversion;

Count VII—breach of fiduciary duty;

Count VIII—fraud in procuring the two railcars of resin from General Poly in July of 1981;

Counts IX and X—dismissed voluntarily by plaintiff;

Count XI—fraudulent misrepresentation of Allied's development of resin;

Count XII—fraudulent concealment of raw material resin supplies during General Poly's existence in business;

Count XIII—overall scheme to defraud.

Plaintiff seeks as damages its loss of inventory converted by Allied, the difference in cost between the Allied resin which was promised and the cost of cover, lost manufacturing time, incurred and unpaid liabilities to vendors and other creditors—including purchasers of General Poly's industrial revenue bonds, past and future loss of profits, and recovery of the benefit and profits Allied has wrongly retained from its Paxon HMWHD resin without compensation to General Poly. Plaintiff estimates its total actual damages at 50 million dollars. In addition, plaintiff seeks punitive damages of 75 million dollars.

Allied has counterclaimed for the amount of outstanding debt owed it by General Poly Corporation—$179,510.40. Allied has moved for summary judgment on its counterclaim.

A moving party is entitled to summary judgment only when the evidence indicates that no genuine issues of material fact exist. F.R.Civ.P. 56(c); *Maughan v. S.W.*

*Servicing, Inc.,* 758 F.2d 1381, 1387 (10th Cir.1985). An issue of fact is "material" only when the dispute is over facts that might affect the outcome of the suit under the governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. ——, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The requirement of a "genuine" issue of fact means that the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Liberty Lobby,* 477 U.S. at ——, 106 S.Ct. at 2510, 91 L.Ed.2d at 211–212. Thus, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment. 477 U.S. at ——, 106 S.Ct. at 2511, 91 L.Ed.2d at 212. The court must consider factual inferences tending to triable issues in the light most favorable to the existence of those issues. *United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986). The court also must consider the record in the light most favorable to the party opposing the motion. *Bee v. Greaves,* 744 F.2d 1387, 1396 (10th Cir. 1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). The language of Rule 56(a) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 265, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### Breach of Oral Agreement

The pivotal issue raised by defendant's motion for summary judgment is whether evidence of alleged oral agreements between the parties is admissible to supplement the September 21, 1979 written agreement. Several of plaintiff's claims (Counts III, IV, V, and XI) are based on the alleged "oral joint venture" agreement entered into on January 10, 1979. Plaintiff claims that at the January 10 meeting the parties agreed: (1) General Poly would work with defendant—by providing extrusion technology—to develop an HMWHD film grade resin "as good as Hoechst," the industry standard, by the time General Poly began operations in late 1979; (2) Allied would price its film grade resin within two cents per pound of its injection molding grade resin; and (3) Allied would sell such resin to General Poly on extended credit terms of at least 90 days. In Count I of the complaint, plaintiff claims defendant breached each of these terms.

Defendant contends the written contract, which was signed on September 21, 1979, is the final, integrated agreement between the parties, and thus the parol evidence rule bars admission of the alleged oral agreements. Defendant further argues that even if the court finds the agreement is only partially integrated, the oral terms contradict the terms of the subsequent written agreement and are therefore inadmissible by virtue of the parol evidence rule. Additionally, defendant asserts that the statute of frauds operates as a defense to the admission of the oral terms. In this regard, defendant argues that because this contract is not capable of being performed within one year, the statute of frauds requires all material terms of the contract to be in writing. Accordingly, defendant argues the evidence of the oral terms is inadmissible.

In the September 21 written contract, the parties agreed that New York law would govern. Therefore, on the contract questions, this court need not address conflict of law issues. However, before turning to an analysis of the facts of this case under the New York parol evidence rule and statute of frauds, the court must determine whether this contract is governed by the Uniform Commercial Code or the common law, or both. Article 2 of the UCC, adopted by New York in 1964, applies to all contracts for the sale of goods. *See* 3 S. Williston, Williston on Contracts § 506B (3d ed. 1960 & Supp.1986). The parol evidence rule is codified in § 2–202, and the statute of frauds in § 2–201. Sales of goods valued at $500 or more must comply with § 2–201. Both the parol evidence rule and the statute of frauds in the UCC are less stringent than at common law. For instance, in order for a written

memorandum to satisfy § 2–201, the writing need not contain all the material terms, but need only indicate that a contract for sale was made. The only term which must appear is the quantity term. The price, time and place of payment or delivery, and the general quality of the goods may be omitted. On the other hand, the "general" New York statute of fraud (general obligations law § 5–701) requires all material terms of the contract to be in writing—resort cannot be made to parol evidence. *Poel v. Brunswick-Balk-Collender Co.*, 216 N.Y. 310, 110 N.E. 619 (1915), *reh. denied* 216 N.Y. 771, 111 N.E. 1098 (1916). Likewise, under the New York common law parol evidence rule, the determination of whether the written contract is integrated must be made without resort to extrinsic evidence and by looking only to whether the document appears incomplete on its face. *Loomis v. New York Central & Hudson River R.R. Co.*, 203 N.Y. 359, 96 N.E. 748 (1911), *reh. denied* 204 N.Y. 588, 97 N.E. 1108 (1912). On the other hand, under the UCC, integration is not presumed. The court must look outside the writing to the proffered oral terms to determine if they would certainly have been included if agreed upon. UCC § 2–201, official comment 3.

Defendant concedes that "one portion of the alleged contract in this case unmistakably relates to the sale of goods and is thus subject to the UCC." (Def. Reply Brief, p. 6.) However, defendant goes on to argue that "it is equally clear that a significant part of the controversy in this lawsuit concerns the quite separable portion of the alleged contract which relates to the *development* of the product rather than the sale of it." *Id.* (emphasis added). Defendant argues this court should bifurcate the contract applying the UCC to the sales portion and the common law to the development portion. In support of its position, defendant relies on the Tenth Circuit's opinion in *Foster v. Colorado Radio Corp.*, 381 F.2d 222 (10th Cir.1967), wherein the court divided a contract for the sale of a radio station into the sale of intangibles (*nongoods* such as good will, etc.) and tangibles (*goods* such as equipment and furnishings), applying the UCC only to the latter.

The *Foster* case is distinguishable from the case at bar in that the contract herein does not involve the sale of goods and nongoods. Rather, it involves only the sale of goods. However, the contract is not entirely for the sale of these goods; it also contains a "development" portion. In this way the contract herein is more akin to a mixed sale and service contract. The majority of courts, when dealing with a mixed sale/service contract, employ a "predominant focus test." *Federal Exp. Corp. v. Pan American World Airways, Inc.*, 623 F.2d 1297 (8th Cir.1980) (applying New York law); *Triangle Underwriters v. Honeywell, Inc.*, 604 F.2d 737 (2d Cir.1979); *Kirby v. Chrysler Corp.*, 554 F.Supp. 743 (D.Md.1982); *Standard Structural Steel Co. v. Debron Corp.*, 515 F.Supp. 803 (D.Conn.1980); *Bailey v. Montgomery Ward & Co.*, 690 P.2d 1280 (Col.1984); *Horn Waterproofing Corp. v. Bushwick Iron & Steel Co., Inc.*, 105 A.D.2d 684, 481 N.Y.S.2d 125 (1984); *Care-Display, Inc. v. Didde-Glaser, Inc.*, 225 Kan. 232, 589 P.2d 599 (1979).

Under the predominant purpose test, the court must determine the "essence" or main objective of the parties' agreement. *North American Leisure Corp. v. A & B Duplicators Ltd.*, 468 F.2d 695, 697 (2d Cir.1972); *Consolidated Edison Co. v. Westinghouse Electric Corp.*, 567 F.Supp. 358, 361 (S.D.N.Y.1983). If the provision of services or rendition of other performance predominates and is not merely incidental or collateral to the sale of goods, then the contract will not be subject to Article 2 of the UCC. *Dynamics Corp. of America v. Intern. Harvester Co.*, 429 F.Supp. 341, 346 (S.D.N.Y.1977). *See also Triangle Underwriters v. Honeywell, Inc.*, 604 F.2d at 742.

Defendant argues that the cases which apply the predominant purpose test nearly always involve construction contracts or sale-with-installation contracts in which the relative value of the goods or services is determinable. *See, e.g.*, 5 A.L.R.4th 502.

While this is true as a general rule, the predominant purpose test has been applied in development/sales contracts such as the one herein. For instance, in *Wico Corp. v. Willis Industries*, 567 F.Supp. 352 (N.D.Ill. 1983), the parties entered a contract which imposed duties of joint obligation to develop the market for silk-screen products used by the electronic game industry and to consult on the design for future products. Wico also agreed to purchase the silk-screen products from Willis on a requirement basis. Willis later breached the contract and Wico sued for rescission and damages. Willis moved to dismiss the claim for rescission arguing that Wico was not entitled to such a remedy under UCC Article 2, as it had accepted the goods and did not allege their nonconformity. Wico argued the contract was for service (development of the market) rather than the sale of goods, so that UCC Article 2 was inapplicable. The court, employing the predominant purpose test, held the sale of goods purpose of the contract predominated, "sale of goods is ... the raison d'etre of the agreements: all of the service aspects of the agreements are aimed at developing and increasing the market for Willis' graphics, and those graphics were to be sold by Wico. This simply is not a situation in which sale of goods is really incidental to the rendition of services." 567 F.Supp. at 355.

Likewise, in *Aluminum Company of America v. Electro Flo Corp.*, 451 F.2d 1115 (10th Cir.1971), the Tenth Circuit Court of Appeals applied the predominant purpose test to a development/sale contract. Defendant Electro Flo was a company which was incorporated for the purpose of making commercial use of an electrified low voltage floor which would provide power to operate "Whirley Dodge" vehicular units for amusement parks. Shortly after its incorporation, employees of the company developed the concept of collapsible electrified floors which could be transported by trailer. Plaintiff Alcoa was an aluminum company which, after several meetings with Electro Flo, became interested in designing the collapsible floor. Plaintiff and defendant eventually entered a contract whereby Alcoa undertook to design and produce the floor within Electro Flo's requirements. Electro Flo agreed to pay tooling expenses and for the necessary materials to produce the aluminum goods. Thereafter, Alcoa produced only inadequate floors which continually failed to meet Electro Flo's requirements. Electro Flo eventually abandoned all materials produced by Alcoa and sought a new designer. Alcoa sued on an open account for goods sold and delivered. Electro Flo counterclaimed for breach of warranty. The trial court found, applying Article 2 of the UCC, that Alcoa had breached its implied warranty. § 2–314. On appeal, Alcoa argued the transaction should have been characterized as one for professional engineering and design services rather than a sale of goods, and that there is no implied warranty as to professional services. The Tenth Circuit held that "the transaction between Alcoa and Electro Flo, while it involved some engineering and design aspects, was in essence a sale of goods," and refused to bifurcate the contract. 451 F.2d at 1118.

The court's holding in *Electro Flo* was a distinct departure from its bifurcation of a contract in *Foster* into its goods and non-goods elements. The *Electro Flo* and *Wico* cases are clearly analogous to the case at bar. Therefore, this court is persuaded to employ the predominant purpose test in determining whether UCC Article 2 applies to the contract.

It is clear to this court that the thrust of the agreement between Allied and General Poly was the sale and purchase of resin. However, in order to make this sale possible, a suitable resin had to be developed. The development portion of the contract was only incidental to the dominant goal of the sale and purchase of the resin. General Poly was only to pay for the final product, not for the development efforts. Because the "sale" aspect of this contract predominates, Article 2 of the UCC will be applied to the entire contract.

Allied argues that even if the court finds Article 2 applies to the entire contract, the contract still must satisfy *both* the UCC statute of frauds and the common law statute of frauds, as the contract not only concerns the sale of goods over $500 but also cannot be performed within one year. Allied relies on comment (b) to Restatement (Second) of Contracts § 110, which provides:

The clauses of the English statute apply separately; one contract may be within more than one clause of the statute and facts which except it from one class may not except it from another. Thus contracts in consideration of marriage or for the sale of land or goods may also be contracts not to be performed within a year, and the statutory requirements in one clause may be satisfied and those of another clause unsatisfied.

Allied also cites *Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d 832, 836–37 (2d.Cir.1980), as authority that a contract subject to the statute of frauds for the sale of goods must also satisfy the general statute of frauds if the contract cannot be performed within one year. Allied's reliance on *Nifty Foods*, however, is misplaced. The contract in *Nifty Foods* was entered into in 1961 prior to the adoption of the UCC in New York. The court, therefore, applied the general statute of frauds. The court observed, "at the time of the making of the alleged agreement, New York law also required that a writing purporting to evidence a contract for the sale of goods contain all the terms of the contract." 614 F.2d at 837. Thus, the *Nifty Foods* case offers no guidance as to whether an oral contract for the sale of goods in excess of $500, which cannot be performed within one year, is subject to the requirements of both 2–201 and the general statute of frauds.

This issue was addressed in *Roth Steel Products v. Sharon Steel Corp.*, 705 F.2d 134 (6th Cir.1983). In *Roth* the court found the two statutes present an irreconcilable conflict because "not all contracts which are enforceable under [the UCC statute of frauds] satisfy the requirements of [the general statute of frauds]." The court then stated:

Generally, when an irreconcilable conflict exists between a special statute and a general statute, the special statute prevails as an exception unless the legislature has expressly manifested a contrary intent. [UCC 2–201] is a special legislative attempt to tailor · the statute of frauds to the unique characteristics of a commercial sales transaction.

705 F.2d at 141. The court then concluded the UCC was an exception to the more general statute of frauds and, therefore, the contract need only satisfy the requirements of 2–201. *See also Highland News Co., Inc. v. The Hearst Corp.*, slip op. 80–413–T (D.Mass. Jan. 22, 1986).

New York follows the rule employed by the *Roth* court that if a conflict exists between a general statute and a special statute, the latter will control. *See Harris v. Jacobs*, 69 Misc.2d 4, 329 N.Y.S.2d 229 (1972); *Erie Co. Water Authority v. Kramer*, 4 App.Div.2d 545, 167 N.Y.S.2d 557 (1957). Therefore, because the statutes in this case involve an irreconcilable conflict as to whether all material terms need be included in the written contract, the UCC statute of frauds must be deemed controlling in this case. In the court's view, this outcome is reconcilable with comment (b) to § 110 of the Second Restatement. The comment specifically states that "the clauses of the *English* [or traditional] statute apply separately." This comment does not address contracts which fall within both the UCC and the traditional statute, but rather contracts which fall within more than one clause of the traditional statute.

UCC § 2–201, the applicable statute of frauds in this case, provides:

(1) Except as otherwise provided in this section a contract for the sale of goods for the price of $500 or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by

the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this paragraph beyond the quantity of goods shown in such writing.

As noted in the official comment, "The required writing need not contain all the material terms of the contract and such material terms as are stated need not be precisely stated. All that is required is that the writing afford a basis for believing that the offered oral evidence rests on a real transaction."

Clearly, the September 21 written contract satisfies the requirements of § 2–201. Moreover, because § 2–201 does not require the inclusion in the writing of all material terms, it does not operate as a bar to plaintiff's proffered evidence of a prior oral agreement. *See Dorman v. Cohen,* 66 A.D.2d 411, 413 N.Y.S.2d 377 (1979). Accordingly, evidence of the alleged oral agreement will be admissible unless barred by the parol evidence rule as set forth in § 2–202, which provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented (a) by course of dealing or usage of trade ... or by course of performance; and (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Allied contends the court must find the September 21 contract was intended as a complete and exclusive statement of the parties' agreement, thereby precluding admission of any additional terms. Allied asserts that a "facial completeness" test must be employed by the court in making this finding. Allied argues that under this test the contract is clearly complete. Allied further argues that in the event the court finds there are any "gaps" in the contract—such as price term—the court must not find the document incomplete, but instead must utilize the UCC "gap-filler" statutes to fill the gaps rather than resort to parol evidence. Alternatively, Allied argues that even if the court finds the agreement is only partially integrated, the proffered oral agreement contradicts, rather than supplements, the written agreement and is therefore inadmissible as a matter of law.

■ The question of whether a written contract is fully integrated—thus precluding introduction of any parol evidence—is characterized as a question of fact, yet it is to be determined by the judge outside the presence of the jury. *Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 763 (10th Cir.1983). Under the UCC there is no presumption that a writing which is final as to some material facts is the complete and exclusive agreement of the parties. UCC § 2–202, official comment (1)(a). Under New York law the court must first examine the "facial completeness" of the writing. *Phillips Brothers v. El Salton, S.A.,* 487 F.Supp. 91, 94 (S.D.N.Y.1980). The more complete a writing appears to be on its face, the less likely it is that any extrinsic terms are agreed upon. *Whirlpool Corp. v. Regis Leasing Corp.,* 29 A.D.2d 395, 288 N.Y.S.2d 337 (1968). The determination of the facial completeness of the written document in this case is appropriate at the summary judgment stage.

■ While the written contract herein evidences the parties had agreed General Poly would have the first right to purchase up to 50,000 pounds of film grade resin each month, the contract does not set forth the price, credit terms, quality of goods, or date of delivery. These omissions—in the view of this court—render this agreement facially incomplete. Allied relies heavily on the case of *Loomis v. New York Central & Hudson River R.R.,* 203 N.Y. 359, 96 N.E.

748, in arguing that the contract herein is *not* facially incomplete. *Loomis* involved a printed form contract in which the space for the designation of the delivery route had been left blank. The New York Supreme Court held that the contract was complete on its face despite this missing term. The court stated the date was "merely incidental and not essential to a perfect agreement ... the effect of not specifying the route was simply to leave that subject open to the choice of the carrier." 203 N.Y. at 368, 96 N.E. 748.

Unlike the routing directions in *Loomis*, the missing terms in the case at bar are material and not merely incidental. For instance, the quality of the goods was of utmost importance to the parties; otherwise the whole development program would have been unnecessary.

Moreover, the contract does not contain a merger or integration clause. When a merger clause is present, there is presumption that the writing is fully integrated. J. White & R. Summers, Uniform Commercial Code, § 2–12 (1972). The omission of a merger clause—while not creating a presumption of incompleteness—is a factor that courts may consider in determining whether a document is incomplete. *See Computerized Radiological Services, Inc. v. Syntex Corp.*, 595 F.Supp. 1495, 1505 (E.D.N.Y.1984); *Drake v. Handman*, 30 F.R.D. 394, 396 (S.D.N.Y.1962); *Goodrich v. Farmers Feed & Supply Co., Inc.*, 55 Or.App. 287, 638 P.2d 1148 (1981).

■ Allied argues that under the UCC the written agreement is not "facially incomplete" due to the omission of the price, credit, quality and delivery terms, because these terms are to be filled in by the UCC's "gap-filler" statutes embodied in § 2–305 (price), § 2–309 (delivery) and § 2–310(a) (time of payment). There is no question that under the UCC *unless otherwise agreed upon* the price to be paid is the "reasonable" price, or market price. UCC § 2–305; *Pulprint, Inc. v. Louisiana-Pacific Corp.*, 124 Misc.2d 728, 730, 477 N.Y.S.2d 540 (1984). Also, *unless otherwise agreed upon*, delivery is to be made within

a reasonable time (§ 2–309) and payment will be due upon delivery (§ 2.310(a)).

However, where there is an agreement setting forth a specific price, time of delivery, and payment, the court is bound to enforce the agreement. In this regard, if there is evidence of an oral agreement as to these terms *which is admissible* under § 2–202 (i.e., supplements the written agreement where not inconsistent and where the writing is not intended as a complete and exclusive statement of the agreement), the court must enforce the agreed terms rather than utilize the gap-filler statutes.

In *George v. Davoli*, 91 Misc.2d 296, 397 N.Y.S.2d 895 (1977), the plaintiff and defendant had entered a contract for the sale of jewelry on approval. The written contract was silent as to the time within which the jewelry had to be returned. The trial court allowed defendant to testify as to the parties' oral agreement on time for return, thereby barring plaintiff's claim for a refund. On appeal, plaintiff argued the UCC gap-filler statutes (§§ 2–326, 2–327), which provide that goods must be returned "seasonably" should have been applied, rather than admission of parol evidence. The appellate court affirmed the lower court, stating, "Returning the merchandise within one week as is the situation in the present case would ordinarily be seasonable or within a reasonable time. *However, where there is an agreement setting forth a specific time limit, the court is bound to enforce such limit.*" (Emphasis added.) Of course, before the court would admit the parol evidence, it ascertained its admissibility under § 2–202. If the evidence had been barred by § 2–202, then—and only then—would the gap-filler statutes have been utilized. *See also Anderson v. Nafziger*, 100 Idaho 175, 595 P.2d 709 (1979).

Allied has cited no cases which hold that the gap-filler statutes are to be used to complete an incomplete agreement despite the existence of an admissible oral agreement as to those matters. Accordingly, this court is not bound to invoke the gap-

filler statutes unless the proffered oral evidence is inadmissible under § 2–202.

Because the contract is incomplete on its face, the court must conclude that the September 21 contract was only a partial memorialization of the parties' previous negotiations and agreements. Allied argues the extrinsic evidence in this case shows the parties intended the writing to embody their entire agreement. However, as stated previously, there is no presumption to this effect under UCC § 2–202. Rather, Allied must prove this was the parties' intent. The true intent of the parties in this case is highly controverted. Therefore, this issue is inappropriate for resolution at the summary judgment stage.

Allied next argues it is entitled to summary judgment on its claim because even if the agreement is not fully integrated, the parol evidence proffered by plaintiff is inadmissible as it contradicts the terms of the written agreement. Under § 2–202, if an agreement is only partially integrated, parol evidence of *consistent additional terms* may be admitted. To be consistent, such terms must not contradict or vary the written contract. Or, stated another way, "to be inconsistent the [oral] term must contradict or *negate* a term of the writing. A term of condition which has a lesser effect is provable." *George v. Davoli*, 91 Misc.2d at 296, 397 N.Y.S.2d 895.

Plaintiff alleges—as to the development portion of the agreement—that the parties agreed plaintiff would assist Allied in the development, testing, and processing of resin, and provide Allied with access to its extrusion technology, equipment, and personnel, and that Allied would assign Mr. Snell to the development program. Allied concedes this evidence merely supplements, but does not contradict, the written agreement. Therefore, the evidence is not inadmissible if the September 21 contract is found to be only a partial memorialization of the parties' agreement.

As to the sale portion of the agreement, plaintiff alleges the parties orally agreed upon the following terms which were omitted from the written agreement:

(1) The price term—2¢/lb. over the price of injection grade molding resin;

(2) The credit term—extended credit of at least 90 days after delivery;

(3) The quality term—"as good as Hoechst";

(4) The delivery date—by the end of 1979.

Allied first argues the alleged oral agreement as to price and credit terms contradicts the "first right to purchase" language in the written agreement. Allied maintains that a "first right to purchase" is equivalent to a "first right of refusal" which courts have held creates a right to purchase the property in question on the same terms and at the same price as the seller is willing to sell to other buyers. The cases on which Allied relies involve sales—usually of real estate—in which the buyer with the right of first refusal has an option to match the highest bid of a third party. *See Costello v. Hoffman*, 30 A.D.2d 530, 291 N.Y.S.2d 116 (1968); *Turner v. Shirk*, 49 Ill.App.3d 764, 7 Ill.Dec. 461, 364 N.E.2d 622 (1977); *Klein v. Brodie*, 167 Mont. 47, 441 P.2d 128 (1968); *Bennett Veneer Factors, Inc. v. Brewer*, 73 Wash.2d 849, 441 P.2d 128 (1968); *Brownies Creek Collieries, Inc. v. Asher Coal Mining Co.*, 417 S.W.2d 249 (Ky.1967). Conversely, the first right of purchase in this case does not contemplate "matching" other buyers. Rather, it simply provides General Poly the contractual right to purchase the first 500,-000 pounds of resin each month. Such a term—in the view of this court—does not imply the price or payment terms. Therefore, parol evidence of an agreement as to price and credit terms does not contradict the written contract and is not inadmissible for this reason.

Allied argues the alleged oral agreement that Allied would develop a resin "as good as Hoechst 9255F"—the industry standard—contradicts the written contract's reference to "film grade resin." (¶ 1.2.) However, "film grade" simply describes the product—it is not a quality term. Therefore, if a quality term such as the one

alleged by Allied was in fact agreed upon, it merely supplements the written agreement. In this regard, it is noteworthy that the "whereas" clauses of the written agreement refer to the development of resin "having special characteristics." Clearly, this phrase requires extrinsic evidence to explain what is meant by "special characteristics." Accordingly, the oral agreement as to the quality of the resin is a "consistent additional term" and, therefore, is admissible to explain or supplement the written agreement.

Allied further argues the alleged oral agreement that Allied would have resin available in commercial quantities by the fall of 1979 squarely contradicts the written contract. Paragraph 1.1 of the written agreement provides for a "one (1) year period of joint cooperation" commencing "upon *execution* of this agreement," during which the parties "shall cooperate with each other to develop high density polyethelene resins." (Emphasis added.) Also, ¶ 1.2 of the written agreement states that Allied's supply commitment to General Poly shall commence "with the production on a semi-commercial or commercial scale of any new high density polyethelene film grade resin," but does not specify a date.

Plaintiff, on the other hand, argues there is no inconsistency. Plaintiff contends the 1–year period of joint cooperation began in January of 1979, when the parties entered their oral agreement, rather than when the written agreement was finally signed in September of 1979. Plaintiff points out Allied began testing its experimental resin as early as March of 1979 (the Peru test), and that Allied would not have done this if the parties had not previously agreed to secrecy. Plaintiff also argues the statement in the written agreement that plaintiff's first right of purchase would begin when Allied began producing resin on a semi-commercial or commercial scale is not inconsistent with the promise that this production would begin in the fall of 1979. Plaintiff argues, "by keying in on the actual date of first production, ¶ 1.1 simply provided a mechanism for assigning a precise starting date for the three-year right of purchase." (Pl.Resp., p. 70, fn. 5.)

The court is not prepared to rule at the summary judgment stage that the "delivery term" is inconsistent. If—as Allied argues—the parties intended the written agreement to be their exclusive agreement and, therefore, the statement that the joint development would begin "upon execution" meant "on September 21, 1979," then a promise to deliver by the fall of 1979 appears to be inconsistent. However, if the September 21 contract simply memorializes—and does not exclude—the alleged oral agreements of January, 1979, then a promise to supply resin by late 1979 is not inconsistent with an agreement for a 1–year period of development which *began* in January of 1979. These conclusions, however, cannot be drawn at this summary judgment stage.

A final bar to the admission of even consistent additional terms to an incomplete document is when the additional terms are such that the parties would certainly have included them in the written document if agreed upon. In official comment 3 to § 2–202, it is stated, "If the additional terms are such that, if agreed upon, they would certainly have been included in the document *in the view of the court*, then evidence of their alleged making must be kept from the trier of fact." (Emphasis added.) *See also Tropical Leasing, Inc. v. Fiermonte Chevrolet, Inc.*, 80 A.D.2d 467, 439 N.Y.S.2d 566 (1981).

The terms missing from the contract in this case, while material, are not terms which in the view of this court would definitely have been included if agreed upon. According to plaintiff, the parties originally intended to memorialize only the development portion of their agreement—the first right to purchase provision was only added at the request of plaintiff in order to assure the bond underwriters that Allied had in fact agreed to supply them with resin. It is not at all surprising that Allied, when reducing the contract to writing, did not include all the sale terms which were favorable to plaintiff. Plaintiff undoubtedly be-

lieved their oral agreement on these terms was sufficient.

Based on all of the foregoing, it is the court's decision that Allied is not entitled to summary judgment on the breach of oral contract claim.

### Breach of Written Contract

■ Allied next contends it is entitled to summary judgment on plaintiff's claim for breach of the written contract (Count II). Allied claims the uncontroverted facts show there was no breach of the written contract whatsoever.

In the pretrial order, plaintiff claims the first right to purchase provision in the September 21 agreement was breached by Allied when it "withheld resin ... suitable for General Poly for months, while attempting to move such resin to General Poly's competitors." (PTO, p. 5.) Plaintiff also claims the first right to purchase provision was violated when Allied withdrew extended credit terms from plaintiff, thereby cutting off plaintiff's ability to purchase. Plaintiff also claims the agreement was breached because Allied failed to ever supply plaintiff with suitable resin.

These claims rest on controverted facts. The court is not prepared to rule at the summary judgment stage that Allied was entitled to breach the first right to purchase provision due to plaintiff's delinquency on payments for off grade resin. Plaintiff has contended that the unsatisfactory quality of the resin caused its delinquency. Plaintiff is entitled to argue these points to the jury.

### Unjust Enrichment & Quantum Meruit

■ In Counts III and V, plaintiff seeks to recover under alternate theories of unjust enrichment and quantum meruit for Allied's royalty-free access to General Poly's extrusion technology. Allied argues these claims must be dismissed as the September 21 agreement specifically provided for the royalty-free access to the extrusion technology.

Having found the September 21 written agreement enforceable under the statute of frauds, the court must agree with Allied on these claims insofar as they are covered by that agreement. However, the court will suspend granting summary judgment on these claims until it is determined if the alleged oral agreement of January, 1979 is admissible. If it is not, Allied's royalty-free rights did not begin until September 21. Because the evidence will show that Allied made use of plaintiff's extrusion technology prior to September 21, plaintiff may still be able to claim it is entitled to compensation for such use under its alternate equitable theories.

### Breach of Finance Agreement

Allied next argues it is entitled to summary judgment on Count IV, plaintiff's claim for breach of the parties' finance agreement (extended credit terms). This claim is incorporated into Counts I and II, and plaintiff has agreed to treat it as such. As previously stated, Allied is not entitled to summary judgment on either Counts I or II.

### Breach of Fiduciary Duty

Allied next contends summary judgment should be entered on plaintiff's claim for breach of fiduciary duty/constructive fraud (Count VII). Plaintiff's claim is that the parties, by virtue of their "joint venture agreement," owed fiduciary duties to one another, and that Allied's conduct over the course of their association was a breach of its fiduciary duties of honesty and fair play. In its motion, Allied asserts that as a matter of law the parties' agreement did not create a joint venture and, therefore, it owed no fiduciary duty to plaintiff.

The parties are in agreement that Kansas law applies to this claim, and also to the fraud claims. The court will proceed on this premise.

The existence of a fiduciary relationship depends on the facts and circumstances of each individual case. *See Denison State Bank v. Madeira,* 230 Kan. 684, 640 P.2d 1235 (1982). "Whether such a relation is

shown to exist is an evidentiary question. It is a question which must be determined in each case by the trier of fact." *Wilkinson v. Cummings*, 194 Kan. 609, 612, 400 P.2d 729 (1965).

In *Denison State Bank* the Kansas Supreme Court recognized that generally there are two types of fiduciary relationships:

> (1) Those specifically created by contract such as principal and agent, attorney and client, and trustee and cestui que trust, for example, and those created by formal legal proceedings such as guardian and/or conservator and ward, and executor or administrator of an estate, among others, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transaction. The determination of the existence of a fiduciary relationship of the first category, though not without problems on occasion, is usually relatively simple. The second category ... becomes more difficult to determine and must depend upon the facts in each case.

230 Kan. at 691, 640 P.2d 1235.

If the parties' agreement created a joint venture, then a fiduciary relation would exist between the parties under the first category, as a joint venture is governed by the same rules of law as partnerships. *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.*, 226 Kan. 70, 76, 596 P.2d 816 (1979); 46 Am.Jur.2d, Joint Ventures § 50, p. 69. The criteria for finding the existence of a joint venture was set forth in *Cinderella Homes* as follows:

> [T]he cases indicate that a joint venture is *an association of two or more persons or corporations to carry out a single business enterprise for profit;* it may be found in the mutual acts and conduct of the parties. Among the acts or conduct which is indicative of a joint venture, but no single one of which is controlling in the determination, are: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement. The following acts or conduct have also been mentioned as being helpful, but one authority does not consider them so: (a) investment in the business of undistributed profits for the purpose of building up a substantial cash reserve; (b) the charging of losses against accumulated profits; and (c) division of undistributed profits in the event of liquidation contingent upon repayment to one of the parties of cash originally invested in capital.

226 Kan. at 76, 596 P.2d 816 (emphasis added).

Plaintiff claims that a joint venture was created by virtue of the parties' agreement to "(1) exercise joint control over certain property, namely, the extrusion technology of General Poly and the developmental resources of Allied; (2) share risk of loss of the value of services and cooperative efforts rendered under the agreement; and (3) exercise mutual control, each according to its specialty, over the joint development of the product." (Pl.Resp., p. 79.)

■ Where the existence of a joint venture is controverted, the relationship may be found in the mutual acts and conduct of the parties. *Cinderella Homes*, 226 Kan. at 77, 596 P.2d 816. In this case, the court is convinced that even when the evidence is viewed in the light most favorable to plaintiff, a joint venture cannot be said to exist. While the parties had agreed to *cooperate* and work in conjunction with each other to develop the resin, they simply were not carrying out a *"single* business enterprise for profit."

■ However, this is not to say that a fiduciary relationship did not exist between the parties due to the special nature of their contractual relationship. If such a relationship existed, it was one *"implied in*

*law* due to the factual situation surrounding the involved transactions and the relationships of the parties to each other and to the questioned transaction." *Denison State Bank*, 230 Kan. at 691, 640 P.2d 1235 (emphasis added). In this case, there is a fact question as to whether such a relationship did exist.

Generally, a buyer/seller relationship does not create a fiduciary duty because the parties are dealing at arm's length and seeking for themselves the best advantage. *See Nifty Foods Corp. v. Great Atlantic & Pacific Tea Co.*, 614 F.2d at 838. However, the facts in this case except it from the general rule. In *Denison State Bank*, the Kansas Supreme Court recognized that the right set of facts may create a fiduciary relationship even though the relationship itself (e.g., bank/depositor) is not fiduciary in nature.

In *Lindholm v. Nelson*, 125 Kan. 223, Syl. ¶ 3, 264 Pac. 50 (1928), the Kansas Supreme Court stated:

A fiduciary relation does not depend upon some technical relation created by, or defined in, law. It may exist under a variety of circumstances, and does exist in cases where there has been a special confidence reposed in one who, in equity and good conscience, is bound to act in good faith and with due regard to the interests of one reposing the confidence.

In *Denison State Bank*, the court recognized that fraudulent concealment is a breach of a fiduciary duty. The court quoted from *Wolf v. Brungardt*, 215 Kan. 272, 282, 524 P.2d 726 (1974), as follows:

"Where one party to a contract or transaction has superior knowledge, or *knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence*, or means of knowledge which are not open to both parties alike, he is under a legal obligation [in essence, fiduciary] to speak, and his silence constitutes fraud, especially when the other party relies upon him to communicate to him the true

state of facts to enable him to judge of the expedience of the bargain."
230 Kan. at 693, 640 P.2d 1235.

In the case at bar, plaintiff alleges that Allied concealed certain material facts of which it had superior knowledge from plaintiff. Specifically, plaintiff claims that Allied concealed that the resin tested at the Lima, Peru plant was not Allied's own resin. Plaintiff also claims that Allied concealed the availability of good quality resin in the summer of 1980 and the spring of 1981. Moreover, plaintiff claims it relied on Allied's oral promises in making its decision to go into business in the first instance, and that Allied's breach of these promises was constructive fraud.

Plaintiff's allegations set forth a sufficient basis on which a jury could find a breach of a fiduciary duty based on the unique relationship of the parties in their cooperative development of the resin, and based on Allied's fraudulent concealment. Accordingly, Allied is not entitled to summary judgment on his claim.

### Fraud & Conversion: Failure to Replace Railcars of Resin

 In Counts VI and VIII of the complaint, plaintiff alleges Allied committed fraud and conversion by failing to fulfill a promise to replace two railcars of poor quality resin, which were secured by plaintiff's bank, with two railcars of high quality resin. Allied contends it is entitled to summary judgment on both claims as plaintiff has failed to set forth sufficient facts to support the claims.

To review the facts involved, plaintiff contends that in June of 1981 it had two full railcars of very poor quality resin which it had previously obtained from Allied. These railcars were subject to a security interest held by plaintiff's bank. Plaintiff had recently completed tests on Allied's new experimental resin and concluded Allied had finally produced a resin "as good as Hoechst." Walker and Traver informed Allied of their desire to purchase the new resin. At a June 3, 1981 meeting at plaintiff's plant, Allied offered to take

back the two railcars of poor quality resin and replace them with the new resin. General Poly agreed to the exchange *if* the replacement railcars would be shipped by the end of the month so as not to impair the security interest held by the bank. The railcars of poor resin were later picked up by Allied but never replaced as promised. In July of 1981, Allied informed General Poly that its extended credit had been withdrawn, but that it could purchase a railcar of the new resin for cash. As it had no alternative and needed the resin, General Poly agreed.

Allied claims plaintiff can produce no evidence showing there was a binding agreement the railcars would be replaced, and further, that any such promise was made with fraudulent intent.

The court must disagree with Allied's position. Traver's affidavit, in and of itself, is sufficient to create a fact question as to what promises were made about replacing the returned railcars. The intent—fraudulent or otherwise—of Allied's representatives cannot be determined by this court as a matter of law. This is clearly a jury question.

In order to establish fraudulent misrepresentation, the plaintiff must set forth facts which show: (1) that an untrue statement was made as a statement of material fact; (2) that the statement was known to be untrue by the party making it and was made with the intent to deceive or recklessly made with disregard for the truth; (3) that the party alleging fraud justifiably relied on the statement; and (4) that as a result of this reliance the party alleging fraud was damaged. *Nordstrom v. Miller,* 227 Kan. 59, 65, 605 P.2d 545 (1980). *See also Professional Investors Life Ins. Co. v. Roussel,* 528 F.Supp. 391, 396 (D.Kan. 1981). Plaintiff must prove its claim by clear and convincing evidence. *Nordstrom,* 227 Kan. at 65, 605 P.2d 545.

The existence of fraud is a question of fact. *Nordstrom,* 227 Kan. at 65, 605 P.2d 545. It is for the jury—not this court—to determine the credibility of the witnesses as to what representations were made and whether such representations were made with fraudulent intent. At this summary judgment stage, plaintiff has, by Traver's affidavit and depositions of Allied's Heath and Wiley, set forth facts sufficient to support a verdict based on clear and convincing evidence. *Celotex Corp. v. Catrett,* 477 U.S. at ——, 106 S.Ct. at 2553, 91 L.Ed.2d at 274.

The conversion claim also rests on controverted fact and Allied is not entitled to judgment thereon as a matter of law. Conversion is defined as the "unauthorized assumption and exercise of the right of ownership over the goods or chattel belonging to another." *Nelson v. Hy-Grade Construction & Materials, Inc.,* 215 Kan. 631, 527 P.2d 1059 (1974). Allied argues that because it was *authorized* to pick up the two railcars of poor quality resin, its action in doing so was not a conversion. However, this "authorization" was allegedly obtained through the misrepresentation that Allied would replace these railcars. "To take possession of personal property where the consent of the owner is induced by fraudulent misrepresentation is a conversion." 18 Am.Jur.2d, Conversion § 32, p. 165; Restatement (Second) of Torts § 252A. Accordingly, if plaintiff can establish its claim of fraudulent misrepresentation, it can also establish conversion. Therefore, Allied is not entitled to summary judgment on this claim.

### *Fraudulent Misrepresentation: Development of Resin*

In Count XI of the complaint, plaintiff claims Allied fraudulently misrepresented and concealed the true status of its development of resin. Plaintiff alleges it detrimentally relied on these representations by going ahead with obtaining bond underwriters, purchasing and installing extrusion equipment, and beginning manufacturing operations. Specifically, plaintiff claims Allied, knowing plaintiff would rely on the resin test conducted at the Peru-Plast Plant in Lima, Peru, sent boxes of resin for testing which were designated as "Allied Developmental Resin" and labeled

"Paxon 7–392 and 6–100" (Allied's trade names), when, in fact, the resin was remarked boxes of Solvay Eltex B5920F, a European-made resin. Allied never informed plaintiff that this resin, which tested quite successfully, was not Allied's own resin.

Allied claims it is entitled to summary judgment because (1) plaintiff was not justified in relying on the Peru tests, as later tests revealed the true state of Allied's resin development, and further, the September 21 agreement specified the development efforts would *begin* on September 21; and (2) even if plaintiff did rely on the tests and can establish fraud, the claim is barred by the applicable statute of limitations, K.S.A. 60–513(a)(3), as plaintiff could reasonably have discovered the fraud more than two years before filing this action.

The court will adamantly deny Allied's motion as to this claim. The facts, when viewed in the light most favorable to plaintiff, show that Allied knowingly represented that a European resin was its own experimental resin and never revealed the truth. Clearly, plaintiff relied on these first experimental tests in proceeding with financing and building its plant. The fact that the August, 1979 test, and later tests, revealed a poor quality resin—while certainly a concern—did not eviscerate plaintiff's right to rely on the Peru tests and Allied's continued assurances that the perfect resin was "just around the corner." Plaintiff has unarguably alleged sufficient facts by which a jury could find fraud under a clear and convincing standard. This issue is ever deserving of resolution by a trier of fact.

Likewise, whether the statute of limitations is a bar because plaintiff could, with due diligence, have "reasonably discovered" the fraud prior to August of 1980 (two years before the filing of this lawsuit) must be decided by the trier of fact. The point of reasonable discovery is a question of fact. *Wolf v. Preferred Risk Life Ins. Co.*, 728 F.2d 1304, 1306 (10th Cir.1984). Plaintiff maintains it could not have reasonably discovered the fraud—even by exercising due diligence—until after discovery began and plaintiff had access to Allied's internal documents. In light of Allied's repeated assurances that its resin was nearly perfected, and the unique "cooperative" relationship between the parties, this court is not prepared to rule as a matter of law that plaintiff could reasonably have discovered the concealment. Accordingly, defendant's motion is denied as to this claim.

### Fraudulent Concealment: Availability of Resin

Allied next claims it is entitled to summary judgment on plaintiff's claim that Allied fraudulently concealed the availability of resin in July of 1980 and again in the spring of 1981. Allied argues it had no obligation to advise General Poly of the existence of specific lots of resin as they were produced, and, in any event, plaintiff's "first right to purchase" was conditioned on its giving 30 days' written notice. According to Allied, plaintiff gave no notice of its desire to purchase resin in either July, 1980 or the spring of 1981.

Plaintiff, on the other hand, alleges that because of the extremely poor quality of the resin it had purchased from Allied, Allied did have a duty—under the first right to purchase provision—to inform plaintiff if and when experimental lots were actually produced in commercial quantities. General Poly maintains it could not have been expected to place orders until it received information from Allied that high quality resin could actually be produced in commercial quantities. Plaintiff states that in July of 1980 Allied had produced a resin which its tests showed would be suitable for General Poly, yet Allied failed to inform General Poly of the test results until September of 1980, *after* it had offered to sell the resin to another buyer. Plaintiff further claims that in the spring of 1981, it tested what it believed was experimental resin and the test results were extremely good. However, Allied did not inform General Poly that it could (and had) produced this resin in commercial quantities, and did not so inform General

**602**

Poly until it had filled orders of other customers. General Poly claims Allied had a duty to disclose all this information to it under the first right to purchase provision, and that Allied's failure to do so was fraudulent concealment.

As previously stated, fraudulent concealment is actionable in Kansas. In *Wolf v. Brungardt*, 215 Kan. at 282, 527 P.2d 1059, the Kansas Supreme Court defined fraudulent concealment as the failure of a party to a contract who has superior knowledge, or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, to communicate to him the true state of facts. Again, the facts underlying this claim are controverted. The court is therefore unable to find that as a matter of law Allied is entitled to summary judgment on this claim.

### Overall Scheme to Defraud

Finally, Allied contends plaintiff's claim in Count XIII, alleging Allied engaged in an overall scheme to defraud, is not pleaded with sufficient particularity, is redundant, and should be stricken.

Plaintiff has adequately alleged fraud claims in Counts VIII, XI and XII. To the extent that the "overall scheme" claim incorporates these claims, it is sufficiently pled as well. To the extent that this claim is redundant and seeks only an alternative claim for relief, it will be stricken.

### Counterclaim

Allied counterclaimed in this action on plaintiff's debt of $179,510.40. Plaintiff has admitted liability. Accordingly, the court will grant summary judgment on this claim as a setoff to any recovery plaintiff may obtain in this action. 11 U.S.C. §§ 507, 726.

IT IS ACCORDINGLY ORDERED this 30 day of October, 1986, that defendant's claim for summary judgment on plaintiff's claims is denied, except as to Count XIII, but summary judgment is granted to defendant on its counterclaim.

Additionally, the court has reviewed counsels' briefs regarding defendant's motion to strike certain witnesses, or, in the alternative, to reopen discovery for purposes of taking additional depositions. The motion is overruled.

This matter is now scheduled to commence jury trial on January 6, 1987. Counsel are directed to file their trial briefs, summaries of key witness testimony and requested instructions on or before January 2, 1987, and to appear in chambers on January 5, 1987, at 3:30 P.M., for a status conference and for consideration of in limine motions, should they arise.