In the Matter of: DAYTON CIRCUIT COURTS # 2 dba Suburban Athletic Club of Oak Creek, Debtor.

Paul D. GILBERT, Trustee, Plaintiff,

v.

SUBURBAN ATHLETIC CLUB and Bank One, Defendants.

Bankruptcy No. 3–83–02063.
Adv. No. 3–83–0793.

United States Bankruptcy Court, S.D. Ohio, W.D.

Dec. 8, 1987.

Dennis L. Hall, Dayton, Ohio, for defendant.

Holly J. Wilson, Cincinnati, Ohio, for Bank One.

Paul D. Gilbert, Dayton, Ohio, for plaintiff.

## DECISION GRANTING PLAINTIFF'S COMPLAINT TO RECOVER PREFERENTIAL TRANSFER

THOMAS F. WALDRON, Bankruptcy Judge.

This proceeding, which arises under 28 U.S.C. § 1334(b) in a case referred to this court by the Order Of Reference entered in this district on July 30, 1984, is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B)—allowance or disallowance of claims against the estate ..., (E)—orders to turn over property of the estate, (F)—proceedings to determine, avoid or recover preferences and (O)—other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor ... relationship .... The matter is before the court upon the

evidence and exhibits presented at trial (Transcript Doc. 29), the Plaintiff's Brief (Doc. 28), the Post–Trial Brief of Defendant Suburban Athletic Club (Doc. 32), and the Plaintiff's Reply Brief (Doc. 35). A motion to dismiss Bank One as a defendant was granted at trial (T. 80).

## I. FACTS

The resolution of this dispute begins with an analysis of the relationship that existed between Congress Park Circuit Court, Ltd. (Congress Park) and Dayton Circuit Courts # 2 (Oak Creek), two (2) racquetball clubs located south of Dayton, Ohio.

Prior to 1982, Congress Park was a partnership in which Dawn Y. Taylor and William C. Taylor were general partners (T. 153), and Oak Creek was a limited partnership with Thomas E. Murray as the general partner (T. 9). Each club was operated independent of the other. (T. 10–11). Sometime in 1982, the general partners of Congress Park and Oak Creek began to discuss developing Suburban Athletic Clubs as a tool to commonly market their operations (T. 11,153–54). It was not, however, until October 1, 1982, that both clubs officially marketed themselves as locations of the Suburban Athletic Clubs (T. 155). No specific written contract was entered into between the parties concerning this relationship (T. 12). Additionally, on October 1, 1982, an electronic funds transfer system (EFT) was entered into between Winters National Bank and Trust Company (Winters, nka Bank One) and Congress Park/Suburban Athletic Club (JT. Ex.1), whereby membership fees would be automatically deducted from the individual bank accounts of club members at both the Oak Creek Club and the Congress Club and then transferred to the bank account of Congress Park for future distribution between the parties. No EFT would result in funds being directly deposited into the account of Oak Creek. (T. 73)

During the course of this relationship, both facilities were made available to the members of either club (T. 11) and the two clubs shared certain revenues and expenses. Membership revenue collected at each facility and through EFT was totalled and split with sixty percent (60%) going to Congress Park and fourty percent (40%) going to Oak Creek (T. 16). Activity fees collected at each facility were not subject to any division (T. 13). Certain expenses relating to marketing the facilities as Suburban Athletic Clubs were split either fifty-fifty (50–50) or sixty-fourty (60–40). (JT Ex.2, T. 40). Not all expenses were shared (T. 33, 71). Each club was responsible for its own construction and maintenance expenses (T. 28). Only two (2) employees, a membership sales person and a fitness director, worked at both facilities. All other employees were employed and supervised separately by either Congress Park or Oak Creek (T. 28). While Mr. Taylor (Congress Park) and Mr. Murray (Oak Creek) met each Wednesday for breakfast to discuss joint marketing expenses, revenues, and other matters (T. 72), they did not have the authority to determine any financial decisions that would bind the other party. (T. 28). Each club kept separate financial records (T. 117–18), separate bank accounts (T. 62, 94), and filed separate tax returns (T. 119). No tax return was filed for Suburban Athletic Clubs (T. 119). Shared revenues and expenses were reconciled periodically and entries reflecting the net amount of each club's distribution were made in the separate bookkeeping systems of Congress Park and Oak Creek (T. 120–21).

On June 8, 1983, as the result of Oak Creek's inability to meet certain financial commitments, Homestead, a secured creditor, took possession of the Oak Creek facility, asked Mr. Murray to leave, and immediately assumed management of the operation (T. 23–24). On that same day, June 8, 1983, Mr. Taylor was advised of the change in ownership and management (T. 16).

On June 9, 1983, William Taylor submitted a computer tape to Winters to effectuate an EFT of all the membership fees due the Oak Creek facility from May 1, 1983 to June 7, 1983. The EFT was completed June 10, 1983 (T. 168). Only Oak Creek membership fees were transferred (T. 164). The net amount of the transfer was $10,103.50 ($11,173 less $1,069.50 in

returns, JT Ex.2). It is this fund that the plaintiff seeks to have returned to the estate of the debtor.

## II. ISSUE

At issue is whether the EFT that took place June 9, 1983 was violative of 11 U.S.C. 547 and, if it was violative of Section 547, did the Defendant have a right pursuant to 11 U.S.C. § 553 to setoff any portion of the net transfer of $10,103.50? [1]

## III. ARGUMENTS

Plaintiff's post-trial brief asserts that the relationship between Congress Park and Oak Creek did not constitute the formation of a joint venture known as Suburban Athletic Clubs and, therefore, the funds transferred were property of the debtor and must be returned to the plaintiff. Plaintiff further alleges that all of the elements of a preference were present and there was not an allowable setoff.

The post-trial brief of the defendant alleges that the transfer of June 9, 1983 was not a transfer of property of the debtor, but that it was a transfer solely of property of Suburban Athletic Clubs, a joint venture between Oak Creek and Congress Park, and, therefore, the only interest plaintiff had in the joint venture property was the right to demand and receive the debtor's interest in the joint venture, if any. The defendant then suggests a series of calculations to determine the debtor's share of the joint venture.

The defendant calculates the joint property interest of the debtor four ways (Doc. 32). First with revenues calculated through June 7, 1983 and all expenses allowed, the net result is Oak Creek owes Congress Park $4,878.17. Next, with revenues calculated through June 30, 1983 and all expenses allowed, the net result is Oak Creek owes Congress Park $918.94. The third method involves calculating revenues through June 7, 1983 and omitting all disputed computer expenses. This net result is that Oak Creek owes Congress Park $1,597.97. Finally, revenues were calculat-

ed through June 30, 1983 and all disputed computer expenses were omitted. This net result is that Congress Park owes Oak Creek $2,360.00.

In the alternative, the defendant argues that if the transfer is found to be a voidable preference, then the defendant is entitled to a setoff in the amount of $4,974.80. He further argues that the elements of Section 553(a)(3) which would prevent this setoff are not present.

The plaintiff's reply brief restates that a joint venture did not exist and the net transfer ($10,103.50) was property of the debtor's estate. Therefore, the plaintiff argues, the defendant's four calculations as to the value of the plaintiff's share of the joint venture are meaningless. The plaintiff asserts that once a preference is established (since the defendant did not claim any exception under § 547(c)), the only issue remaining is what, if any, setoff applies.

## IV. DECISION

### A. Joint Venture

In order to decide this proceeding, it is first necessary to determine whether a joint venture existed between Congress Park and Oak Creek at the time of the transfer of the funds in question.

The Ohio Supreme Court has defined a joint venture in the following manner: A joint venture is '... an association of persons with intent, by way of contract, express or implied, to engage in and carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers ...'. (Citations omitted) *Matter of Sluss*, 56 B.R. 575, 579 (Bankr.S.D.Ohio 1986).

---

1. While plaintiff alleged a violation of 11 U.S.C. § 548 in his complaint, neither the plaintiff nor the defendant addressed the issue, nor does the court find it necessary to discuss § 548.

Reliance is commonly placed upon several basic elements which "[H]ave, from time to time, been considered as pointing to a joint venture, although perhaps not any one of them is conclusive.". *Detachable Bit Co. v. Timken Roller Bearing Co.*, 133 F.2d 632, 635 (6th Cir.1943). These basic elements include:

(1) As between the parties, a contract is essential to create the relationship of joint venturers. However, the contract need not be express and may be implied from the conduct of the parties or from facts and circumstances which make it appear that a joint enterprise was entered into.

(2) The parties must intend to associate themselves as joint venturers.

(3) There must be a community of interest between the parties in the complete enterprise and the agreement between the parties to the business venture must contemplate that they combine their money, property, services, or time, or all of these, to the undertaking.

(4) There must exist between the parties the right of joint proprietorship with each party to the joint venture having control of the means employed to carry out the common purpose.

(5) There must be an agreement for a division between the parties of the accrued profits resulting from a single business venture. The courts are split as to if there need be a specific agreement to share losses. 13 O.Jur.3d. *Business Relationships*, § 1094–1098 (1979 & Supp.1987).

■ In order to establish the existence of a joint venture, the burden of proof is upon the party who asserts that the relationship existed. 46 AM Jur.2d. *Joint Venture*, § 69 (1969 & Supp.1987), "Where the existence of a joint venture is controverted, the relationship may be found in the mutual acts and conduct of the parties (citation omitted)." *Rajala v. Allied Corp.*, 66 B.R. 582, 598 (D.Kan.1986). In view of the evidence presented at trial and all memoranda submitted, the defendant has failed to meet his burden of proof. As the court stated in *Rajala*, "[T]he court is

convinced that even when the evidence is viewed in the light most favorable to plaintiff, a joint venture cannot be said to exist. While the parties had agreed to *cooperate* and work in conjunction with each other to develop the resin, they simply were not carrying out a '*single* business enterprise for profit.'" *Id.*

■ In the proceeding before the court, the parties may have been carrying out various marketing, advertising or promotional ideas in an attempt to reduce expenses and thereby increase profit; however, the parties were not carrying out a single business enterprise, i.e., the operation of a single racquetball facility with two separate locations, for profit. Neither the documents presented by the parties, nor the actions of the parties are sufficient to establish the elements necessary to establish a joint venture:

### (1) CONTRACT

As between the parties, there was not a written contract setting forth the agreement of the parties (T. 12). While Congress Park and Oak Creek did market themselves as Suburban Athletic Clubs, it can not be implied from the conduct of the parties or from the exhibits and testimony presented that a joint venture existed. Not all revenues were shared, nor were all expenses shared (T. 33, 71). In fact, the only expenses shared related to the advertising and marketing concepts, including the employment of two (2) persons, a membership sales person and a fitness director, who worked at both facilities (T. 28). While the two (2) facilities were open to members of both clubs, each club was managed independently of the other, neither party could make binding financial decisions for the other and each party maintained separate record-keeping and tax reporting (T. 117–119). The regular Wednesday meetings were directed toward marketing the two facilities (T. 72). Even the bookkeeper for both facilities, Philip Lambert, described Suburban Athletic Clubs as an "umbrella arrangement ... a common marketing idea, they would share advertising and revenues and certain expenses ..." (T. 82).

## (2) INTENT

The parties' testimony concerning their intent to associate as a joint venture is in conflict. Plaintiff asserts that the intent of the parties was to have two (2) separate clubs marketing themselves as Suburban Athletic Clubs (T. 69, 70, 140). The Defendant's testimony is unclear and inconsistent. The defendant stated that "[W]e decided jointly that we would market ourselves a (sic) Suburban Athletic Club and that one of the key points would be to market, share the expenses of the marketing, share the revenue of memberships and *each of us would accept responsibilities within our clubs* and we would have a reconciliation of these things periodically as we went through it." (emphasis added) (T. 154), The defendant then testified about a "partnership" (T. 153–65) , "Tom's club" (T. 163–169), "my club" (T. 159), and stated that the name Suburban Athletic Clubs was the property of Congress Park (T. 159). What is clear is that since there is no written contract to establish the parties' intent, the parties' conduct and testimony is not sufficient to establish a joint venture.

## (3) CONTRIBUTIONS

As noted above, there was not a community of interest between the parties in a single racquetball business enterprise. Although the parties agreed that a member could choose to use either club; neither party could require the other to operate his club in any specific way, with any specific employees, at any specific times, with any specific programs, etc. Not only were all revenues not shared, neither party could direct the use of the other's revenues. Finally, the testimony revealed that the services, time, skill, and knowledge of plaintiff, Tom Murray (Oak Creek) and the defendant, William Taylor (Congress Park) were combined only to the extent of their weekly Wednesday meeting concerning marketing (T. 72), but remained separate for the operation of each party's respective club.

## (4) JOINT PROPRIETORSHIP AND CONTROL

Neither the plaintiff nor the defendant had the authority to independently make any marketing decisions concerning Suburban Athletic Clubs. All advertising projects were either jointly agreed upon or dismissed (T. 72). In the operation of Oak Creek and Congress Park, Plaintiff and Defendant, did not: (1) jointly supervise the employees of the two clubs (T. 28), (2) assume the responsibility for the debts of one another, (T. 28, 39, 84) or (3) make financial decisions for one another (T. 28). The plaintiff and the defendant had separate financial records (T. 117), bank accounts (T. 142), and tax returns (T. 119). Reconciliations were made periodically in each club's accounting system to reflect a net distribution (T. 120–21).

## (5) SHARE OF PROFITS

The Suburban Athletic Clubs relationship did not result in profits. The plaintiff and defendant did not combine the revenues and expenses of both clubs to achieve a net "profit" (T. 13, 28). Accordingly, the plaintiff's position is correct, "[T]he legal requisites of a partnership and/or a joint venture have not been met in this particular case." (Doc. 35).

## B. PREFERENCE

■ Section 547 of the Bankruptcy Code permits the trustee to avoid certain transfers of a debtor's property:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before much transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such a creditor at the time of such transfer was as an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under Chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

In this proceeding, all five (5) elements of a preference have been established. First, the EFT was a transfer of the debtor's property. The relationship of the plaintiff and the defendant was a debtor/creditor relationship. The transfer was "for or on account of an antecedent debt owed by the debtor before such transfer was made" (Jt. Ex. 2), made while the debtor was insolvent (§ 547(f)—this presumption remained uncontested and unrebutted during the trial), within 90 days before the date of the filing of the petition (T. 75), which enabled the creditor/defendant to receive more than if the transfer had not been made (T. 75).

The defendant did not seek to avoid the preference in accordance with Section 547(c). Therefore, the court must address what right, if any, the defendant had to a setoff of all or any portion of the funds transferred.

## C. SETOFF

■ Section 553 permits a creditor to offset a mutual debt owed by the creditor to the debtor under certain circumstances:

(a) Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case, except to the extent that—

(1) the claim of such creditor against the debtor is disallowed other than under section 502(b)(3) of this title;

(2) such claim was transferred, by an entity other than the debtor, to such creditor—

(A) after the commencement of the case; or

(B)(i) after 90 days before the date of the filing of the petition; and

(ii) while the debtor was insolvent; or

(3) the debt owed to the debtor by such creditor was incurred by such creditor—

(A) after 90 days before the date of the filing of the petition,

(B) while the debtor was insolvent; and

(C) for the purpose of obtaining a right of setoff against the debtor.

The Sixth Circuit has stated that:

The application of setoff ... is permissive and lies within the equitable discretion of the trial court. *I.R.S. v. Norton,* 717 F.2d 767, 772 (3rd Cir.1983); *In re Davies,* 27 B.R. 898, 901 (Bankr.E.D.N.Y. 1983). The intent of the statute is clear that one creditor should not be unfairly favored over the class of creditors and, when justice dictates, setoff, must be denied. *In re Southern Indus. Banking Corp.,* 809 F.2d 329, 332 (6th Cir.1987).

The exceptions to setoff found in 553(a)(1) and (2) are not applicable to the defendant's claim in this matter. The final exception to setoff found in 553(a)(3) is arguably applicable to the defendant's claim in this matter.

The defendant seeks to setoff certain expenses listed in Joint Exhibit 2. Of these expenses, the amount stated as a membership input fee and the amount stated as a fee for computer programming are disputed by the parties.

The testimony of the the plaintiff, the defendant, and the bookkeeper, Phillip Lambert, is that the dollar amount claimed by the defendant as a computer programming expense and the amount claimed as a membership input expense were not agreed to by the parties (T. 35, 85, 156, 169). In fact, the plaintiff testified that he understood that there was not to be a programming fee at all (T. 44, 53–55). Further testimony revealed that the first time these

two amounts appeared as a claimed expense was as part of Joint Exhibit 2 (T. 35, 55, 130–132).

Taking into consideration the testimony, credibility and demeanor of the witnesses concerning these two claimed expenses, it is clear that, at a minimum, the amount and timing of these expenses as a debt due the defendant from the debtor is questionable. "§ 553(a)(3) is intended to eliminate an opportunity for a creditor to engage in some form of manipulation at the expense of other creditors" *In re Brooks Farms*, 70 B.R. 368, 372 (Bankr.E.D.Wis.1987). The facts of this case establish that a manipulation occurred.

Even if the amount of these two disputed expenses were allowed as debts due to the defendant from the plaintiff, the defendant's right to setoff would be denied consistent with the reasoning in decisions denying a bank's right to setoff deposits, where, similar to the electronic funds transfer (EFT) in this proceeding, a bank accepted or "built up" deposits for the purpose of obtaining a right to setoff. As between the parties, the defendant rather than the plaintiff: (1) created and developed the EFT program (T. 154), (2) was the signator to the EFT agreement with the bank (Joint Ex.1), (3) controlled the timing and amounts of any EFT (T. 162), and, (4) although an EFT was often subject to a two (2) month delay, within a day of learning that a secured creditor had removed the debtor from the operation of the Oak Creek Club, caused an EFT to be made to his (Congress Park's) bank account of all May and part of June membership fees for the Oak Creek, but *only* the Oak Creek Club (T. 164, 181). (The transfer of Congress Park fees for this period was not completed until August, 1983 (T. 165).

The clear effect of this EFT, which was solely controlled by the defendant, was to allow a fund that the defendant had built up to be transferred solely to the defendant. Thus, he would receive a net ten thousand, one hundred three dollars and fifty cents ($10,103.50) when no other unsecured creditor would receive any funds. Neither the language of the bankruptcy code nor existing case law permits such a result.

The general rule applied to cases involving a bank's setoff of funds in a depositor's account was stated by the court in *In re PRS Products, Inc.*, 574 F.2d 414, 418 (8th Cir.1978):

> Ordinarily no voidable preference is created when a bank sets off funds in a general deposit account against a debt owed to the bank by the depositer.... The set-off exception does not apply where a deposit is accepted by a bank with an intent to apply it on a pre-existing claim against the depositor (citations omitted). *In re Union Cartage Co.*, 38 B.R. 134, 139 (Bankr.N.D.Ohio 1984)

*Accord. Matter of Dutton*, 15 B.R. 318, 321 (Bankr.D.N.J.1981), *Matter of PRS Products, Inc.*, 574 F.2d 414, 418 (8th Cir.1978).

## PREJUDGMENT INTEREST

■ As this court has held (*Matter of Foreman*, 59 B.R. 145, 154–57 (Bankr.S.D. Ohio 1986)), prejudgment interest at the rate established by 28 U.S.C. § 1961(a) will be permitted from the date the complaint was filed until payment is made to the trustee. *Accord In re Missionary Baptist Foundation of America*, 69 B.R. 536 (Bankr.N.D.Tex.1987), *In re H.P. King Co., Inc.*, 64 B.R. 487 (Bankr.E.D.N.C.1986).

## CONCLUSION

The net transfer of ten thousand, one hundred three dollars and fifty cents ($10,-103.50) having been found a preference under 11 U.S.C. § 547(b) is HEREBY AVOIDED.

The claimed setoff of the defendant is DENIED.

The defendant is ORDERED to pay the plaintiff ten thousand, one hundred three dollars and fifty cents ($10,103.50) plus interest in accordance with 28 U.S.C. § 1961(a) from November 17, 1983, the date the complaint was filed, together with the cost of the filing fee for this adversary proceeding.

In order to recognize the effect of this decision on the interest of the defendant, Suburban Athletic Club is granted thirty

(30) days from the date of this decision in which to file an original or amended proof of claim in this case.

An order in accordance with this decision is simultaneously entered.