**In re L & T STEEL FABRICATORS, INC., Debtor.**

**Joan B. PARMELEE, Trustee, Plaintiff,**

**v.**

**BANK OF GREENSBURG, Defendant.**

Bankruptcy No. 86–01147.

Adv. No. 87–0210.

United States Bankruptcy Court, M.D. Louisiana.

June 23, 1989.

Robert J. Carter, Greensburg, La., for plaintiff/trustee.

W. Hugh Sibley, Amite, La., for defendant, Bank of Greensburg.

## REASONS FOR DECISION

LOUIS M. PHILLIPS, Bankruptcy Judge.

This adversary proceeding, brought by the Trustee against the Bank of Greensburg (the Bank) seeking recovery of an alleged preferential transfer, came on for trial on January 31, 1989, pursuant to and in conformity with a "Memorandum Opinion and Order Pursuant to Rule 56(d)" (the Opinion and Order). The Opinion and Order was rendered after hearing on a Motion for Summary Judgment brought by the Trustee. Pursuant to Rule 56(d), made applicable to this proceeding by Bankruptcy Rule 7056, the Court determined that certain material facts existed without controversy and could be found without the necessity of trial; and therefore, certain issues were resolved without the necessity of trial. Within the Opinion and Order the Court fixed a trial date and set forth what factual issues were reserved for trial.

Rather than attach the Opinion and Order as an appendix to these reasons, the Court, for the sake of convenience, will recast its previously issued Memorandum Opinion, supplemented by findings of fact and conclusions of law emanating from the trial of this proceeding.

### Background

On May 28, 1986 the debtor, L & T Steel Fabricators, Inc. (L & T Steel), through its president and sole owner, Joseph Lombar-

do, executed a promissory note in the principal amount of $337,919.93, payable on demand to the Bank of Greensburg (the Bank). This note, according to the stipulations between the parties, represented a renewal of existing antecedent debt in the amount of $297,919.93 and an extension of a new loan in the amount of $40,000. As security for payment of all indebtedness evidenced by the note, L & T Steel had executed a pledge agreement dated May 27, 1986, by which it purported to pledge its accounts receivable to the Bank, and had also executed a $500,000 collateral chattel mortgage, dated May 27, 1986, purporting to encumber most, if not all, of the equipment owned by L & T Steel. This mortgage was apparently recorded in the office of the Clerk of Court and Recorder of Mortgages in and for the Parish of St. Helena, State of Louisiana, on May 29, 1986.

On May 30, 1986, two days after the execution of the note and three days after execution of the collateral chattel mortgage and pledge of the accounts receivable, the Bank filed an executory process petition in state court seeking to foreclose on the collateral covered by the pledge of accounts receivable and the collateral chattel mortgage. The equipment and accounts receivable were sold to the Bank at sheriff's sale on June 25, 1986 for the bid price of $350,000. The Bank, on July 10, 1986, sold the equipment and accounts to a third party corporation, Southland Steel, for the price of $345,258.82 (see Exhibit D–1 introduced at trial by agreement of the counsel).[1] An involuntary bankruptcy petition seeking an order of relief under Chapter 7 was filed against L & T Steel on August 5, 1986, within ninety days after May 27, 1986. Pursuant to a motion filed by L & T Steel prior to trial of the involuntary petition, an order was signed on September 2, 1986 converting the case to a case under Chapter 11. Other than filing schedules and statements of affairs, there was no activity in the Chapter 11 case until a motion to convert the case to one under Chapter 7 was filed by a creditor on March 17, 1987. On April 9, 1987, the Debtor-in-Possession filed a plan and disclosure statement. Notwithstanding the plan and disclosure statement the case was converted to a case under Chapter 7 by Order dated April 17, 1987.

On December 11, 1987, the trustee brought this adversary proceeding specifically seeking an order avoiding the transfer of the accounts receivable and equipment to the Bank to the extent of $297,919.93 (the amount of the preexisting indebtedness "collateralized" by the May 27, 1986 security agreements) and ordering the return of $297,919.93 to the estate. The trustee also prayed for "all relief that may be proper in the premises."

The Trustee subsequently brought a Motion for Summary Judgment (the Trustee's Motion). After hearing, the aforementioned Opinion and Order was rendered. In summary, the Court found, based upon the stipulated facts, affidavits, depositions and other exhibits in support of and in opposition to the Trustee's Motion, that there was no issue of fact that required resolution regarding the transfer to the Bank, to the extent of $297,919.93. This amount was found to be preferential. The Court found that the remaining $40,000 of the principal indebtedness paid by means of the transfer of accounts and equipment had been new value given in consideration of the granting of the collateral chattel mortgage. Therefore, as $40,000 worth of the debt had been properly secured by an unavoidable security interest, the transfer was found to be unavoidable to that extent. However, as the sales price paid by the Bank at sheriff's sale was stipulated by the

---

1. The Court notes below that the sole owner of L & T Steel, Mr. Joseph Lombardo, was a director of the Bank at the time of the transactions at issue here and also was the sole owner of Southland Steel, the purchaser of the equipment and accounts from the Bank. The depositions of Mr. Lombardo and Mr. Henry Meyers, a bank official, clearly establish that Mr. Lombardo had personally guaranteed the L & T Steel debt to the Bank. Counsel for the Trustee has asserted that this tripartite affiliation of Mr. Lombardo gave rise to the friendly and expeditious manner in which the sheriff's sale was effectuated and the subsequent sale by the Bank to Southland Steel was consummated.

parties to be $350,000, it appeared that there was some $12,080.87 of the purchase price paid by the Bank which remained unaccounted for.

On the authority of Rule 54(c), Federal Rules of Civil Procedure, made applicable to the proceeding by Bankruptcy Rule 7054, trial was ordered for the purpose of determining whether the $12,080.87 constituted an additional component of the preference and also for the purpose of allowing the introduction of evidence "relevant to the issues of the right to prejudgment interest," the time at which the accrual of prejudgment interest, if granted, would commence and the appropriate rate that should apply (the Trustee had alleged a right to interest from June 11, 1986, which, as shown below, was not a meaningful date; rather it was the date on which the property was advertised by the sheriff). There was also a factual dispute regarding the validity of the pledge of the accounts as between the parties prior to the execution of the May 27, 1986 agreement purporting to pledge the accounts receivable which was reserved for trial. As will be shown, the Court has assumed, for purposes of the prior Opinion and Order and these reasons, that the pledge was valid between the parties prior to the execution of the agreement and 90 days before the petition date, and therefore need not decide whether the pledge of accounts was valid between the parties.

### Jurisdiction of the Court

This is a proceeding arising under Title 11 U.S.C. over which the United States District Court for the Middle District of Louisiana has original jurisdiction pursuant to 28 U.S.C. § 1334(b). Under the authority of 28 U.S.C. § 157(a), the United States District Court for the Middle District of Louisiana, by Local Rule 29 (now Rule 22) has referred all such cases to the Bankruptcy Judge for the district and has ordered the Bankruptcy Judge to exercise all authority permitted by 28 U.S.C. § 157.

This is a core proceeding as defined in 28 U.S.C. § 157(b)(2)(F). Pursuant to 28 U.S.C. § 157(b)(1), the Bankruptcy Judge for this district may hear and determine all core proceedings and may enter appropriate orders and judgments.

No party has objected to the exercise of jurisdiction by the Bankruptcy Judge. No party has filed a motion for discretionary abstention pursuant to 28 U.S.C. § 1334(c)(1) or pursuant to 11 U.S.C. § 305. No party filed a timely motion for mandatory abstention under 28 U.S.C. § 1334(c)(2). No party has filed a motion under 28 U.S.C. § 157(d) to withdraw all or part of the case or any proceeding thereunder, and the District Court has not done so on its own motion.

### Facts

*Stipulated Facts:*

The parties at hearing on the Trustee's Motion stipulated certain facts agreed to be material, and further agreed that there were no additional facts which needed to be considered prior to a determination of the rights of the parties regarding the alleged $297,919.93 preference.

At hearing on and for purposes of the Trustee's Motion, the parties agreed that there was no dispute as to the following material facts:

(1) As of May 26, 1986, L & T Steel was indebted to the Bank in the amount of $297,919.93.

(2) On May 28, 1986 L & T Steel executed a promissory note in the principal amount of $337,919.93, which evidenced a renewal of the preexisting indebtedness and the extension of a $40,000 new loan.

(3) There was no preexisting chattel mortgage or security interest in favor of the Bank in, to or upon the equipment of L & T Steel prior to the May 27, 1986 collateral chattel mortgage.

(4) Prior to 90 days before the filing of the involuntary petition which initiated this case, the Bank was in possession of the invoices of L & T Steel to third party account debtors, which were made subject of the May 27, 1986 pledge agreement regarding the accounts receivable and invoic-

es of L & T Steel.[2]

(5) The account debtors under the invoices held by and allegedly pledged to the Bank did not receive written notice of the alleged pledge prior to the Sheriff's sale from the Bank, L & T Steel or Mr. Joseph Lombardo (and there were no affidavits or other papers in opposition to the Trustee's Motion which would tend to show that any other party provided such notice).

(6) L & T Steel was insolvent as of ninety (90) days prior to the involuntary petition initiating this case, and as of the execution of the collateral mortgage, the agreement purporting to pledge the accounts receivable and the sheriff's sale.

(7) The Bank bid the sum of $350,000 for accounts receivable and equipment of L & T Steel at the sheriff's sale held pursuant to the executory process petition foreclosing on the property covered by the May 27, 1986 security agreements, by offsetting its claim against the purchase price bid (in other words, no cash was paid to the debtor).

*Facts Adduced at Trial:*

(1) The $350,000 purchase price bid by the Bank at sheriff's sale was not all actually paid (notwithstanding the stipulation by the Bank for purposes of the Trustee's motion). Of the bid, $337,919.93 was credited against the principal balance of the May 28, 1986, note; $1,941.75 was credited against Clerk of Court and sheriff costs, sheriff's commission, advertising expense and an appraisal fee (see Defendant # 2); $5,370.56 was credited against accrued interest (Defendant # 3);[3] and $26.58 was deposited into the bank account of counsel for the Bank (representation of the Bank's counsel, which was stipulated to by attorney for the Trustee). The total price actually paid by the Bank amounted to $345,258.82.[4]

(2) Of the $5,370.56 in accrued interest paid by means of the transfer of equipment and accounts, $644.47 of the interest is found to have accrued upon the $40,000 portion of the antecedent debt ($40,000 is 12% of $337,919.93 and therefore $644.47, or 12% of $5,370.56, is the interest which accrued on the new loan portion). Also, twelve percent (12%) of the sheriff's costs and attorney's fees shown to have been paid, or $236.20, is attributable to the $40,000 new loan portion. Based upon the representation of counsel for the Trustee, that he possessed an appraisal of the mortgaged equipment indicating a value greatly in excess of $40,000, the Court finds that for purposes of this complaint there was sufficient value in the equipment to support the payment of interest and costs attributable to the $40,000 new loan.

(3) From the date of the execution of the May 27, 1986, security agreements and as of the transfer of the accounts and inventory from the Bank to Southland Steel, Mr. Joseph Lombardo was at all times (i) sole owner and president of L & T Steel; (ii) a

2. The factual dispute as to whether the invoices held by the Bank contain written notations identifying the invoices with the indebtedness of L & T Steel to the Bank is dealt with below. For purposes of hearing on the Trustee's Motion (with full reservation of rights for purposes of trial), the trustee stipulated that the invoices contained notations by the Bank referring to the indebtedness of L & T Steel and indicating the intention of the Bank that the invoices be held in pledge as security for the payment thereof. The Court received a post-hearing letter from counsel for the trustee regarding the possibility of a factual dispute, but as indicated by the stipulation, for purposes of the Trustee's motion and for these reasons, the contents of the letter were ignored.

3. Exhibit D-3 establishes that the Bank accrued interest through July 11, 1986. The sheriff's sale took place, and the sheriff's deed was exe-

cuted on June·25, 1986. The deed was recorded in the records of the Clerk of Court on July 7, 1986, and the $1,941.75 in costs due the sheriff was paid by check dated July 9, 1986(D-2). However, given the representation of counsel for the Bank that $5,370.56 worth of the purchase price went toward accrued interest, and Defendant's Exhibit D-3, the Court finds that the full $5,370.56 was "earned" by the Bank and, therefore, constituted a portion of the debt paid by the transfer.

4. The difference between the bid price and the payment actually made, as found by the Court, or or $4,741.18, was a bid cushion afforded the Bank under its "security documents," primarily, however, through attorney's fees provisions. The testimony and evidence showed that the bid cushion was never paid by the Bank out of the collateral or to the attorney out of the collateral.

member of the Board of Directors of the Bank; and (iii) sole owner and president of Southland Steel.

(4) On November 10, 1986, Mr. Robert Carter, now counsel for the Trustee (but then as counsel for certain of the creditors of the estate), advised counsel for L & T Steel (as debtor-in-possession), in writing, of the necessity of protecting the rights of the estate regarding the transfer of the accounts to the Bank and requested that counsel for the debtor-in-possession take the necessary action to effect avoidance of the transfer. This notice also stated: "If I have not heard from you in ten days, my clients will be forced to ask relief from the Bankruptcy Court." (Trustee # 4). The record in the case is devoid of any indication of activity either by counsel for the debtor-in-possession or by Mr. Carter regarding the transfers to the Bank until the filing of the Trustee's complaint (on December 11, 1987), and therefore the Court finds that no further demand was made on account of the transfer until the filing of the complaint by the trustee.

Discussion and Conclusions of Law

*Whether the Transfer of Equipment and Accounts to the Bank Was an Avoidable Preference:*

As mentioned, L & T Steel engaged in a series of transfers, the first—granting the security interests in the accounts and the equipment—being voluntary, and the second—sale of the property by the sheriff to the Bank—being "involuntary" in nature.

For purposes of the Trustee's Motion and this judgment, the execution of the May 26, 1986 agreement purporting to pledge the accounts receivable of L & T Steel to the Bank, in fact, created no substantive change in the extent of the Bank's rights as "pledgee" of the accounts. The parties stipulated at hearing that the invoices evidencing the accounts due L & T Steel were in the possession of the Bank as of the date of the written pledge agreement and contained written notations regarding the amount of the L & T Steel debt and the intention that the invoices be held in pledge by the Bank to secure the L & T Steel debt. Therefore, by stipulation, the "pledge" of

accounts, as between the parties, was as good or as bad the day before the May 27, 1986 pledge agreement as the day after the agreement was executed.

The collateral chattel mortgage, on the other hand, did give rise to a security interest in favor of the Bank that did not previously exist. The "involuntary" transfer of the equipment of L & T Steel to the Bank by means of sheriff's sale, then, was grounded in a security interest which was granted within 90 days prior to the petition date. The transfer is therefore to be avoided, says the trustee, because the preferential mortgage lien provided the right of seizure and sale. It is not disputed by the parties that the transfer of the mortgaged equipment to the Bank was preferential under § 547. The Bank has argued, however, and the trustee has stipulated, that the preference represented by the sale of equipment should be offset by the $40,000 new loan pursuant to § 547(c)(1). Notwithstanding the admission regarding the transfer of equipment, counsel for the Bank suggested at hearing on the Trustee's Motion (though not formally through opposition or memorandum) that summary judgment was an improper vehicle for determining the value of the transfer of the equipment since, as the transfer of the accounts was not preferential in nature, only a valuation of the equipment (by trial and expert testimony) could determine whether the value of the equipment exceeded the $40,000 new value. This suggestion will be dealt with after the discussion of the accounts.

The trustee argued at the initial hearing that summary judgment on the entire $297,919.93 was appropriate since, as the transfer of the accounts to the Bank was a preference, the only offset to the entire price paid by the Bank should be the $40,000 new loan (obviating the necessity of valuing the equipment or the accounts). For this reason, and, it seems, for the reason that both parties appear convinced that the value of the equipment formed a minor component of the purchase price paid by the Bank, the focus of the Trustee's Motion and the Bank's opposition was upon the

transfer of the accounts subject to the "pledge."

The requirements of a voidable preference are set out in the Bankruptcy Code under 11 U.S.C. § 547(b) which provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; *and*

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

*The Accounts:*

The parties do not dispute that the transfer of the accounts satisfied the requirements of § 547(b)(1)–(4). However, the Bank argues that because it had a duly perfected pledge of accounts receivable prior to the date of the May 27, 1986 pledge agreement (and prior to 90 days before the petition date), the receipt of the accounts at sheriff's sale constituted payment on a secured debt, and therefore the Bank received no more than it would have if L & T Steel were liquidated under Chapter 7.

In support of *and* in opposition to the Trustee's Motion, the parties focused on the Louisiana state law requirements for the valid pledge *as between the parties* of a non-negotiable incorporeal evidenced by a written instrument. The trustee contends that prior to the written pledge agreement (on May 27, 1986), the Bank did not have a valid pledge of the accounts; the Bank contends that it did. The trustee cites Louisiana Civil Code Article 3160 and the case of *Citizens Bank & Trust Co. v. Consolidated Terminal Warehouse, Inc.*, 460 So.2d 663 (La.App. 1st Cir.1984) as controlling on this issue; so does the Bank.

Louisiana Civil Code Article 3160 provides, in part, that the pledge of a non-negotiable instrument or credit "shall be complete as to all the world, as soon as the debtor of such pledged credit or instrument shall have been notified in writing of the giving of such pledge." [5] Similarly, the Louisiana First Circuit in the *Citizens Bank* case stated that "[t]he only requirements are delivery of the writing to the pledgee and notice to the debtor, if the instrument is non-negotiable." *Id.* at 669. The trustee, therefore, reads Civil Code Articles 3158 and 3160 and the *Citizens Bank* case, as requiring written notice to account debtors (the debtors on the credit or instrument) before a pledge can be valid against any party, including the pledgor, and asserts that since the "pledge" in existence prior to the execution of the pledge agreement was invalid as between the Bank and L & T Steel, the transfer of the accounts receivable to the Bank constituted a payment by the debtor on an unsecured debt. *See* Stipulated Fact Number (5).

The Bank argues that *Citizens Bank* and Civil Code Article 3160 require notice to the account debtor only for the pledge of accounts to be effective against third parties, and therefore, that the delivery of the invoices by L & T Steel to the Bank, prior to the May 27, 1986 pledge agreement, was the only act necessary to perfect a valid pledge between the Bank and L & T Steel (without consideration of whether the pledge, thus perfected, would be perfected

---

5. *See also* Civil Code Art. 3158 which states, after referring to the requirements of perfecting the pledge of notes, bills of lading, stocks, bonds, *etc.* against third parties, that, "provided that where the pledge of instruments not negotiable, the debtor must be notified thereof ..."

against third parties). Since the pledge was valid as between the parties, argues the Bank, the transfer of accounts receivable constituted payment of a secured debt, and the requirement of § 547(b)(5) is therefore not met. Although the Bank has not directed this Court to any jurisprudence supporting its assertion that the preexisting pledge was valid between the parties despite absence of written notice to the account debtors, Louisiana State courts have reached conflicting results on that issue. *Compare Williams v. Succession of Robertson; In re Mamus,* 133 La. 640, 63 So. 250 (1913) with *American Bank & Trust Co. v. Straughan,* 248 So.2d 73 (La. App.1971). Most recently, the Louisiana First Circuit Court of Appeals has ruled that notification of the account debtor is not necessary for there to be a valid pledge between the immediate parties to the pledge agreement. *See Louisiana National Bank of Baton Rouge v. O'Brien,* 439 So.2d 552, 555 (La.App. 1st Cir.1983).

■ Notwithstanding the sole focus of the parties herein upon the issue of whether the pledge was valid between L & T Steel and the Bank, the issue of whether the pledge was effective between the parties to the contract of pledge is irrelevant to the disposition of this case. In *Braniff Airways, Inc. v. Exxon Co., USA,* 814 F.2d 1030 (5th Cir.1987), the Fifth Circuit set forth the § 547(b)(5) analysis as follows: "To compare what the creditor would have received in a Chapter 7 liquidation with what it received pre-petition, it is necessary to consider how the debt would have been treated in a Chapter 7 liquidation ... That is, if the debtor had not made the payment to the creditor, and the debtor were liquidated, it must be determined what amount the creditor would receive." *Id.* at 1034. Under the Louisiana Civil Code, it is clear that in order to perfect pledge of a non-negotiable instrument or credit (such as the accounts at issue) against third parties, the debtors on the instrument or credit must receive written notice of the pledge. Louisiana Civil Code Arts. 3158 and 3160. Because the account debtors in this case received no written notice of the purported pledge of accounts to the Bank prior to the sheriff's sale, the lien was unperfected against third parties at the time of the transfer of the accounts to the Bank.[6]

Following *Braniff,* then, the analysis of the Bank's position had the transfer not been made is quite simple. If the Bank had not received the accounts receivable in payment of its debt, the Bank would have held a claim against the debtor, would have asserted that its claim was secured by the purported pledge of accounts and that at liquidation the Bank should receive the accounts receivable or the value thereof in payment of its claim.

However, what did the Bank really have, in the way of a lien, at the moment before the transfer? Answer: the Bank, by virtue of its "pledge," had the right to perfect the pledge against third parties by issuing written notice thereof to the account debtors. Since this would have been the extent of the Bank's rights under the pledge, the pledge would not have been perfected against the Chapter 7 trustee, who, pursuant to 11 U.S.C. § 544(a)(1) possesses all rights and powers of a hypothetical lien creditor on a contract and under (a)(2) possesses all rights of a hypothetical judgment creditor possessing a writ of execution that has been returned unsatisfied as of the date of the filing of the petition. Therefore, had a bankruptcy petition been filed the moment before the transfer of the accounts, it is clear that the trustee could have avoided the "pledge" pursuant to § 544(a)(1) or (2), and therefore it is clear that the Bank would not have received the value of the accounts in a Chapter 7 liquidation. Since the trustee would have avoided the transfer for the benefit of all creditors, liquidated the accounts and distributed the value *pro rata* among the unsecured creditors of the estate (after

---

6. In other words, up to the seizure of the accounts by the Sheriff, L & T Steel could have issued a first priority assignment of accounts receivable in, to and upon the accounts subject to the "pledge" by complying with La.R.S. 9:3101, *et seq;* or a judgment creditor could have seized the rights of L & T Steel in, to and upon the accounts and such a seizure could have primed the right of the Bank under the "pledge."

payment of administrative expenses and priority claims), the Bank clearly received more than it would have received in a liquidation had the transfer not been made. The requirement of § 547(b)(5) is therefore met.

Several courts have addressed the issue presented in this case: a transfer on account of a security agreement which is not perfected against third parties as of the transfer. In *In re World Financial Services Center, Inc.,* 78 B.R. 239 (9th Cir.B.A. P.1987), the Ninth Circuit Bankruptcy Appellate Panel affirmed the bankruptcy court's conclusion that a payment on an allegedly secured installment note was a preferential transfer because the financing statement did not properly perfect the creditor's security interest against third parties under the California Commercial Code and therefore would have been avoidable pursuant to 11 U.S.C. § 544. *Id.* at 242. Similarly, in *In re Express Fruit & Produce, Inc.,* 16 B.R. 366 (Bankr.D.Minn., 1982), the court found that although the creditor had acquired a consensual lien on a trailer securing a $5,933.87 payment, the lien was unrecorded and therefore could be defeated by the trustee pursuant to § 544(a). Hence, the court found that the creditor who had received payment on the debt "secured" by the consensual lien was preferred over similar creditors and ordered the creditor to return the money received. The court in *In re Denmark Co., Inc.,* 73 B.R. 325 (Bankr.S.D.Fla.1987) held that payment to a gasoline supplier was a preferential transfer because the supplier, which had failed to perfect any security interest in gasoline, was not a secured creditor, although the supplier alleged that gasoline had been consigned to the debtor. Similarly, in *In re Slater,* 54 B.R. 186 (Bankr.D.S.C.1985), a transfer from a Chapter 7 debtor to a creditor within 90 days of bankruptcy did not come within the exception to avoidable preferences relating to perfected security interests, as the creditor's security interest (an assignment of contract rights) was unperfected against third parties at time of transfer in that no

financing statement had been filed with the Secretary of State. *See also In re Express Liquors, Inc.,* 65 B.R. 952 (Bankr.D.Md. 1986); *In re Villa Roel, Inc.,* 57 B.R. 879 (Bankr.D.D.C.1985).

■ Very simply, a creditor who is a transferee of property of a debtor on account of a security interest that is not perfected as to third parties in accordance with applicable state law (if all other criteria of § 547(b) are met), receives more than that creditor would receive at liquidation without the transfer, since the Chapter 7 trustee, after rendering that creditor's claim unsecured by means of his § 544 avoiding powers, would distribute the property among all unsecured creditors of the estate (after payment of administrative expenses).[7]

The transfer of the accounts to the Bank, therefore, was an avoidable preference under 11 U.S.C. § 547(b), to which no defense or exception applies except § 547(c)(1), with respect to the stipulated "new value" of approximately $40,000 given in consideration of the grant of the collateral chattel mortgage on the L & T Steel equipment. The finding that the transfer of the accounts was preferential resolves the question of whether there are facts concerning apportionment of the value of the components of the transferred property (equipment and accounts) which could only be resolved through trial.

*Value of Preference:*

■ Pursuant to 11 U.S.C. § 550(a) the Bank is liable to the trustee to return the property transferred or the value thereof. As stated above, counsel for the Bank represented at hearing on the Trustee's Motion that the property transferred at sheriff's sale to the Bank was immediately thereafter transferred by the Bank to a third party corporation. This representation was confirmed by evidence introduced by the Bank at the subsequent trial (See Defendant #1). Therefore, the most appropriate remedy afforded by § 550 regarding the preference is the payment by the Bank to the trustee a sum equal to the

---

**7.** Insolvency of a debtor mathematically requires this conclusion.

value of the property transferred (as established by the price paid by the Bank and thereafter received from Southland Steel), less the appropriate reduction pursuant to § 547(c)(1).

As established by facts (1) and (2) found at trial, the Bank actually paid $345,258.82 for the equipment and accounts. As found above, $5,370.56 of the price represented accrued interest; $1,941.75 represented the payment of costs of the sale; and $26.58 was paid to the attorney for the Bank. As of the date of the transfer, the total principal balance due the Bank was $337,919.93. The Bank is entitled to a $40,000 reduction of the preference pursuant to § 547(c)(1), applied against the principal balance due. The reduction of $40,000 represents a twelve percent (12%) reduction of the portion of the purchase price attributable to the payment of the principal due the bank. The Bank is therefore entitled to a like reduction in the amount of the preferential payment attributable to interest, costs and attorney's fees. The Court concludes, upon fact number (2) found at trial, that the preference is to be reduced by an additional $880.67, the portion of interest, costs and attorney's fees which is attributable to the $40,000.

While the trustee's complaint specifically prays for the return of $297,919.93, the facts adduced in connection with the trial of this proceeding show that the trustee is entitled to avoidance of transfer with a value of $304,378.15. In connection with the complaint initiating this proceeding, wherein the trustee also prays "for all relief that may be proper in the premises," this Court possesses the authority to render judgment consistent with the allegations within and the facts adduced in connection with the complaint, despite a limiting prayer. F.R.Cv.P. 54(c); Bankruptcy Rule 7054; *In re Herman Hassinger, Inc.*, 41 B.R. 787 (Bkrtcy., E.D.Pa., 1984).[8]

Therefore, for the foregoing reasons and upon the foregoing facts, the Court finds that the Bank received a transfer of $304,-378.15 which is avoidable pursuant to § 547, and that under § 550(a) the Bank is liable for the return of said $304,378.15 to the trustee.

*Prejudgment Interest:*

■ The trustee has alleged in the complaint that prejudgment interest should accrue upon the judgment ordering the return of the value of the transfer from June 11, 1986. There was no evidence adduced at trial which established June 11, 1986 as a pivotal date (the sheriff's deed indicates that the Sheriff advertised the sale on June 11, 1986, but it appears that the Sheriff's sale took place on June 25, 1986). Through pretrial memorandum, counsel for the trustee argues that May 28, 1986, the date of the "transactions," is the date on which interest should begin to accrue. Alternatively, the trustee argues that a letter from the trustee's attorney to counsel for L & T Steel during the Chapter 11 case (written while counsel was representing a creditor of L & T Steel) constitutes the date of demand from which interest should accrue.

The Bank does not concede that prejudgment interest is due, but asserts that prejudgment interest, if allowed, should be limited to legal interest accruing from the date the complaint was filed (December 11, 1987).

The law in this Circuit, and the law generally recognized, is that a trustee is entitled to prejudgment interest if successful in avoiding a preferential transfer, generally from the date of demand for the return of the property transferred and the value thereof or from judicial demand, at a rate to be determined by the Court pursuant to 28 U.S.C. § 1961. *Kaufman v. Tredway*, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190 (1904) ("We see no reason to doubt the propriety of allowing interest on the claim from the commencement of the action. Such commencement is itself a demand." at 273, 25 S.Ct. at 34, 49 L.Ed. at 192); *Palmer v. Radio Corporation of America*, 453 F.2d 1133 (5th Cir.1971); *Smith v. Mark Twain National Bank*, 805 F.2d 278

---

**8.** Rule 54(c) reads, in pertinent part, "Except as to a party against whom a judgment is by default, every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings."

(8th Cir.1986); *In re Southern Indust. Banking Corp.*, 87 B.R. 518 (Bankr.E.D. Tenn.1988); *In re Baker & Getty Financial Services, Inc.*, 88 B.R. 792 (Bankr.N.D. Ohio 1988); *Matter of Dayton Circuit Courts No. 2*, 80 B.R. 434 (Bankr.S.D.Ohio 1987); *In re Air One, Inc.*, 80 B.R. 145 (Bankr.E.D.Mo.1987); *Matter of Ullman*, 80 B.R. 101 (Bankr.S.D.Ohio 1987); *In re H & S Transport Co., Inc.*, 78 B.R. 519 (Bankr.M.D.Tenn.1987); *In re Fulghum Const. Corp.*, 78 B.R. 146 (D.C. M.D.Tenn. 1987); *In re Republic Financial Corp.*, 75 B.R. 840 (Bankr.N.D.Okla.1987); *In re Missionary Baptist Foundation of America*, 69 B.R. 536 (Bankr.N.D.Tex.1987); *In re H.P. King Co. Inc.*, 64 B.R. 487 (Bankr.E. D.N.C.1986).[9]

In addition to the pre-Code jurisprudential authority for prejudgment interest (*Kaufman, supra; Palmer, supra, etc.*), and although there is no express provision within the Bankruptcy Code providing for prejudgment interest upon a § 547 action, § 550 of the Code does provide that a successful preference action will result in either the return of the property transferred "or, if the court so orders, the *value* of such property ..." (emphasis supplied). Courts have interpreted this provision as codal authority for a court to award interest in order to insure the return of the value of the property calculated as of the date of demand (or the date the complaint is filed if no prior demand). In order to preserve the value of the property (*i.e.*, present value), prejudgment interest is necessary to protect the time value of the property transferred. See *In re H.P. King Co., Inc., supra* at 489; *In re Production Steel, Inc.*, 60 B.R. 4, 5 (Bankr.M.D.Tenn. 1986); *Matter of Foreman Industries, Inc.*, 59 B.R. 145, 155 (Bankr.S.D.Ohio 1986). This reading of the Code is consistent with pre-Code jurisprudence and provides a statutory ground for the awarding of prejudgment interest in order to compensate the estate for any dimunition in the value of the property transferred while in the hands of the transferee and to compensate the estate for the loss of use of the property prior to judgment.

In this proceeding, prejudgment interest is appropriate. As this opinion shows, the transfer is basically avoidable as a matter of law; and there are no extraordinary circumstances which have prolonged the litigation. The Bank has presumably been earning interest on the property transferred to it as a result of the sale of the property by the Bank to Southland Steel (the Court assumes a credit sale which would earn interest, but if the sale is for cash, the Bank retains the interest-earning capacity by loans of the purchase price to other customers). There is simply no equitable or rational basis to deny prejudgment interest to the estate while allowing the Bank to earn interest on the transfer pending judgment (28 U.S.C. § 1961 specifically takes care of the time after judgment).

*Interest From When?:*

The trustee asserts that there is an equitable exception to the rule espoused within the aforementioned cases: that interest should run from the date of the transfer if the transferee is engaged in fraud or bad faith in connection therewith. The single case cited by the trustee as establishing this equitable exception is *In re Production Steel, Inc.*, 60 B.R. 4 (Bankr.M.D. Tenn.1986), wherein the court states that:

> the courts awarding interest from the date of transfer generally have found special circumstances such as blatant fraud or bad faith in connection with the transfer.

at 5. This equitable exception has been recognized by several courts. See *Matter of Wholesale Furniture Mart, Inc.*, 24 B.R. 240 (Bankr.W.D.Mo.1982)—(in a case of conversion, interest awarded from date of conversion—following Missouri law); *In*

---

9. The Court is aware of certain decisions which refer to state law as providing both the laws as to whether prejudgment interest is awardable and if so the appropriate rate. *See In re Art Shirt Ltd., Inc.*, 68 B.R. 316 (Bankr.E.D.Pa.1986); affirmed 93 B.R. 333 (E.D.Pa.1988). This Court declines to align itself with such an approach, as 28 U.S.C. § 1961 provides the most appropriate standard for fixing the rate of prejudgment interest upon federal claims (in this instance arising under title 11). *In re H.P. King Co., Inc., supra* at 490 (and cases cited therein).

re Independent Clearing House Co., 41 B.R. 985 (Bankr.D.Utah 1984) ("It is recognized that where transfers are made with actual intent to hinder, delay, or defraud creditors, or the transferee is guilty of culpable misconduct, prejudgment interest may be awarded from the date of the transfer." at 1015); In re Four Seasons Sporting Goods, Inc., 46 B.R. 528 (Bankr.N.D. Cal.1985) (Courts have on occasion awarded interest from the date of the transfer "where blatant fraud or bad faith in connection with the transfer was demonstrated" at 531); In re Southern Industrial Banking Corporation, 87 B.R. 518 (Bankr. E.D.Tenn.1988) ("When the transferee behaves fraudulently or in bad faith, interest is calculated from the date of the transfer, on the theory that the transfer was wrongful when made." at 522).

The trustee argues that bad faith or fraud is shown by the evidence establishing affinity among Mr. Lombardo, L & T Steel, Southland Steel and the Bank. The inter-relationship is established and detailed above. However, there is evidence to offset the allegation of bad faith (which is grounded in the relationship among the parties that, according to the trustee, remains intact (i.e., Mr. Lombardo remains a member of the Board of Directors of the Bank)).

The evidence tending to offset the bad faith inference that the trustee draws from the inter-relationship of the players is the evidence pertaining to the purported pledge of the accounts to the Bank prior to the execution of the pledge of agreement. While the Court has deemed it unnecessary to rule on whether the pledge of accounts was valid between the Bank and L & T Steel, the Bank had been in possession of the invoices from the inception of the loan relationship (apparently). References to specific invoices are typed on the back of the promissory notes of L & T Steel (though there are no references to notes typed on the invoices—a precondition for a valid pledge according to the trustee). Henry B. Meyers, president of the Bank, and Fay W. Williams, a vice president, testified through deposition and stipulated affidavit, respectively, that the procedure employed by the Bank was intended to create a pledge of specific account invoices against specific loans (generally, according to Ms. Williams, made in amount equal to eighty percent of the invoice amount). There is evidence upon which a trier of fact could determine that the Bank at least believed it had a pledge of accounts valid against L & T Steel.

As mentioned, the collateral chattel mortgage is preferential, offset by the contemporaneous new loan. There was no valuation of the equipment transferred to the Bank, and therefore there can be no basis upon which to determine whether any of the Bank's antecedent debt was paid by the transfer of the equipment.

Additionally, the Court notes that although creditors and parties in interest were aware of the transfer within ninety (90) days thereafter, the preference complaint was not filed until some 17–18 months after the sale of accounts and equipment to the Bank (some five months after the case was converted to a Chapter 7 case). The trustee attempts to "poison the well" by repeated references to the failure of the debtor while debtor-in-possession (i) to file the monthly reports required by this Court; (ii) to attempt to bring a plan of reorganization; (iii) to attempt to recover the preference; and (iv) generally to do anything.[10] There was no action taken by

---

10. The Court takes judicial notice of the case file and the near laughable assertions within the disclosure statement filed by the debtor only after and in response to the motion to convert, including; "subsequent to the filing of their Chapter 11 proceeding, the debtors in possession and their attorneys have made a diligent effort to discover any and all claims the debtors ... may have against any other entity. It is the intention of the debtors and their attorneys to diligently pursue any such claims or causes of action providing same are economically feasible and are in the best interest of the creditors of the estate." Disclosure Statement, pleading 23, page 6 (emphasis by the Court). The disclosure statement does not contain a single reference to the preference action. The plan proposed along with the disclosure statement is a liquidating plan devoid of reference to the preference action. Certainly, neither the debtor in possession or its attorneys faced their fiduciary duty squarely. All the more reason for parties in

creditors in the Chapter 11 case seeking either to bring the preference action or to effect conversion, appointment of a trustee, *etc.* for over six (6) months after the filing date, notwithstanding (as the trustee argues) "that L & T had no assets remaining, and Mr. Lombardo was using all former L & T assets under the corporate name, Southland Steel, Inc." (Trustee Memorandum In Support of Amended Pre–Judgment and Post–Judgment Interest, page 3). There is no assertion that the Court (Honorable Wesley W. Steen, presiding) was misled by the debtor-in-possession so as to be somehow implicated in a dragged-out Chapter 11. Simply put, the debtor did nothing to upset the apple cart that Mr. Lombardo was pulling for the Bank, and the creditors did nothing to upset the debtor. The Court should not now be asked to rebuke the debtor for failure to push what ultimately would have been a most distasteful Chapter 11 case to Mr. Lombardo and his corporations when it was not pushed to do so in a timely fashion by those who were there.

The cases carving out the equitable exception of interest from the transfer due to fraud or bad faith are concerned that the bankruptcy court not allow the estate to suffer the loss of the time value of the property transferred as a result of inherently wrongful transfers (such as conversions) or as a result of conduct which, by its fraudulent nature, has kept interested parties from discovering the transaction and being able to take appropriate action to demand return and minimize the loss to the estate. The cases do not purport to foster inactivity on the part of the very creditors harmed by the loss of such value.

This proceeding involves a transfer which was found by this Court to be avoidable to a great extent as a matter of law due to the finding that the pledge was not perfected against third parties as of the date of the transfer. However, upon the Court's finding (i) that there is evidence favorable to the Bank as to whether the Bank believed there was a valid pledge

interest to *take interest,* and avail themselves of the rights and protections afforded by the Bank-

between the parties; (ii) that the transfer was an open-air (advertised) sheriff's sale, not concealed from the outside world; (iii) that there is no basis for determining whether the transfer of the equipment subject to the mortgage resulted in payment of *any* of the antecedent debt; and (iv) that the parties who could have moved earlier did not; the Court finds that the conduct of the Bank was not fraudulent or in bad faith to an extent sufficient to trigger the running of interest from the date of the transactions or the sale to the Bank.

The trustee has argued, alternatively, that the November 11, 1986 letter to counsel for L & T Steel, then a debtor-in-possession, constitutes demand for purposes of fixing the date upon which interest began to accrue. The letter, however, only demanded that counsel not "take any action that would prejudice the rights of any creditors of L & T Steel Fabricators, Inc. in releasing the Bank of Greensburg...." (Trustee # 4). The letter also advises that "If I have not heard from you in ten days, my clients will be forced to ask relief from the Bankruptcy Court."

On its face the November 11, 1986 letter is a demand on the Chapter 11 attorneys to do something about the preference. There was no evidence adduced at trial establishing that this demand, which perhaps made its way to the debtor (from counsel), was ever served upon the Bank. The Court supposes that the trustee would have this Court impose upon the Bank knowledge of the demand on the basis of Mr. Lombardo's presumed knowledge, since he was a director of the Bank at the time. However, as such a demand could have triggered a default in the new note (of Southland Steel) which Mr. Lombardo guaranteed, and as the Court has seen no evidence whatsoever which would tend to show that Mr. Lombardo paid the slightest attention to his duty to avoid conflicts of interest, the Court assumes that Mr. Lombardo, if he was in fact aware of the demand, would have withheld such information from the

ruptcy Code.

Bank notwithstanding the scope of his duty to the Bank's shareholders. The Court notes further that the record in this bankruptcy case contains no indication of any action taken by the clients of the attorney who is now trustee's counsel (or by the attorney himself), despite the threatened (or promised) action referred to in the letter. The roundabout demand does not rise to the level of a direct demand for the return of the property subject of the transfer, since it was not proven that the Bank ever received the letter. Since the Court makes this finding, there need be no finding as to whether the letter, if served, would have constituted a substantive demand *on the Bank* for the return of the property transferred. Upon the foregoing, the Court concludes that the November 11, 1986 letter does not constitute demand upon the Bank sufficient to trigger the running of prejudgment interest from the date thereof.

*Rate and Compounding of Prejudgment Interest:*

Prejudgment interest shall accrue upon the amount of the preferential transfer from December 11, 1987 through the entry of the Order prepared upon these Reasons for Decision, at an interest rate equal to the average accepted auction price for the purchase of 52–week U.S. Treasury bills settled as of November 19, 1987 (6.93%), compounded on an annual basis and as of the date of the entry of judgment (*see* 28 U.S.C. § 1961(b)). Thereafter, interest shall accrue upon the aggregate of the principal amount of the judgment to be

entered ($304,378.15) plus the amount of prejudgment interest that has accrued up to judgment, at a rate equal to the average yield on the 52–week bills settled immediately prior to judgment (the June 1, 1989 settlement yielded an average 8.85%).[11]

**11.** The compounding of prejudgment interest annually and additionally as of the date of entry of judgment is appropriate given the appropriation of § 1961 for use in connection with prejudgment interest. This treatment has received specific judicial approval. *In re Republic Financial Corp.,* 75 B.R. 840 (Bankr.N.D.Okla.1987); *In re Southern Industrial Banking Corp., supra,* at 524. This Court's holding that prejudgment interest shall accrue at a fixed rate does not constitute a holding that fluctuating prejudgment interest rates shall never be awarded (*see In re H.P. King Co., Inc., supra,* p. 492, footnote 6; *In re Southern Industrial Banking Corp., supra* at 523–524), but is rather a finding that the rate fluctuation between November 19, 1987 and June 1, 1989 (6.93% to 9.20% as of

12/15/88, and down to 8.85% as of June 1, 1989) is not dramatic enough to warrant a fluctuating rate. The concern underlying the award of a fluctuating interest rate is the avoidance of "uncertain litigation incentives". *Southern Industrial Banking Corp., supra* at 523. However, the contra approach focuses upon the difficulty in determining the appropriate adjustments, the timing of fluctuations and the calculation of interest as well as pointing out the logical inconsistency inherent in the use of a floating interest rate though § 1961 (which requires a fixed rate postjudgment) is appropriated as providing the rate of interest that accrues prejudgment. *See In re Missionary Baptist Foundation of America, supra,* at 539.